[Sac. No. 1936.   Department One.—August 5, 1912.]

## MALVENA GALLATIN et al., Appellants, v. CORNING IRRIGATION COMPANY et al., Respondents.

WATER-RIGHTS—APPROPRIATION OF EXTRAORDINARY FLOOD WATERS AS AGAINST RIPARIAN PROPRIETOR.—The flood waters of a stream, which are of no substantial benefit to the riparian owner or to his land, and are not used by him, may be taken at will by any person who can lawfully gain access to the stream, and conducted to lands not riparian, and even beyond the watershed, without the consent of the riparian owner and without compensation to him.

ID.—FLOOD WATERS NOT PARCEL OF RIPARIAN LAND.—Such flood waters are not a part of the flow of the stream which constitutes a "parcel" of the land of the riparian owner, within the meaning of the law of riparian rights.

ID.—ORDINARY FLOOD WATERS PART OF USUAL FLOW OF STREAM.—The foregoing rule is not in conflict with the decisions in the cases of *Miller* v. *Bay Cities Water Co.*, 157 Cal. 256, *Miller & Lux* v. *Ma-*

*dera etc. Co.,* 155 Cal. 59, and *Miller & Lux* v. *Enterprise Co.,* 145 Cal. 652. In those cases the water in question, although in a sense high water, or flood water, was nevertheless a part of the regular and usual flow of the stream for a considerable part of each year and at a time when such flow was of substantial use and benefit to the riparian lands, or the flow of such waters in their accustomed place was necessary to the gathering of water in subterranean strata from which the owners of overlying land were entitled to take it.

ID.—THREATENED DIVERSION OF ORDINARY FLOW—ACTION TO ENJOIN—DISCLAIMER AS TO ALL WATERS EXCEPT FLOOD WATERS—OTHER ISSUES RENDERED IMMATERIAL—COSTS.—In an action by riparian owners to enjoin the defendant from making a threatened diversion of a certain portion of the waters of the ordinary flow of a stream, under a notice of appropriation thereof previously made, and by means of diversion works then in course of construction, an answer, in which the defendant denied any intention of taking water under such prior notice, and disclaimed any right to or intention to take any waters except flood waters, under a notice posted subsequent to the commencement of the action, accompanied by a statement to a similar effect made at the trial, had the effect to eliminate the question of the right and intent of the defendant to take a part of the usual and ordinary flow of the stream; and where the judgment gave the defendant no right to any waters except unusual flood waters, the evidence as to the other water-right once claimed by the defendant under its prior notice, and errors of law in admitting or excluding evidence of it, became, for the purposes of an appeal by the plaintiffs, wholly immaterial and harmless, except upon the question of costs.

ID.—ALLOWANCE OF COSTS IN EQUITABLE ACTION—DISCRETION NOT ABUSED.—In such an equitable action costs are allowed, apportioned, or withheld in the discretion of the court. Under all the circumstances shown, it cannot be said that the trial court abused its discretion in awarding costs to the defendant.

ID.—ONLY LANDS BORDERING STREAM HAVE RIPARIAN RIGHTS.—In law, only those tracts of land which border upon the stream, notwithstanding others may be included within the watershed thereof, are endued with riparian rights.

ID.—JUDGMENT AWARDING FLOOD WATERS TO APPROPRIATOR—POSSIBILITY OF USE BY RIPARIAN PROPRIETOR.—As such extraordinary flood waters do not come within the protection of the law of riparian rights, a judgment awarding an appropriator a portion thereof for nonriparian use cannot be assailed by riparian owners because of a mere possibility that they might in the future desire to impound such waters for use on their own lands.

ID.—APPEAL—IMMATERIAL EVIDENCE AND RULINGS THEREON—USE OF WATER BY APPROPRIATOR.—On an appeal by the riparian owners

from the judgment awarding the appropriator a portion of the extraordinary flood waters, the evidence concerning the recording of the notice of appropriation, and as to the exact amount of the riparian land, and the use to which the defendant intended to apply the water, becomes immaterial, and errors in relation thereto require no consideration, as they could not operate to the prejudice of the appellants.

ID.—FINDINGS AS TO PERCOLATION AND SEEPAGE—EVIDENCE.—The evidence, although conflicting, is held to sustain the finding that there was no percolation or seepage of water from the stream which benefited the riparian land, and was ample to have warranted the court in concluding that the water to be taken by the defendant would have no appreciable effect upon such seepage or percolation as may occur, and that its flow down the stream would not in that matter benefit the plaintiffs' land.

ID.—FINDINGS—SITUATION OF HEADGATE—JUDGMENT REQUIRING HEADGATE TO BE MAINTAINED IN CONFORMITY WITH CONDITIONS EXISTING—FINDING OF AMOUNT OF ORDINARY FLOW IMMATERIAL.—Where the findings in such action determine that the headgate of the defendant's diversion dam is situated at such a height above the stream that it will not divert any water therefrom except during unusual floods and freshets, and the judgment awarding it a portion of such unusual flood waters requires such headgate and the bed of the stream to be kept in conformity with existing conditions so that no other water will ever be taken, and specifies the width and depth at which the channel of the stream is to be maintained for that purpose, the riparian proprietors are sufficiently protected thereby against the taking of the ordinary flow and ordinary flood waters, and a finding as to the exact amount of the ordinary flow and ordinary flood waters is immaterial.

ID.—JUDGMENT A MANDATORY INJUNCTION—DEFENDANT MAY BE COMPELLED TO MAINTAIN RELATIVE POSITION OF HEADGATE WITH BED OF STREAM.—Such judgment operates as a mandatory injunction against the defendants taking any portion of the ordinary flow or ordinary flood waters of the stream, and safeguards the plaintiffs against changes of conditions from any cause, natural as well as artificial. If the bed of the stream should fill up, either naturally or artificially, so that the water to which the plaintiffs were entitled was diverted by the headgate, the defendant could be compelled to refrain from diverting any water at all until it had restored the stream to the condition, with respect to its capacity to carry water past the gate, as that in which it was at the time the judgment was rendered.

ID.—FAILURE TO FIND AS TO EXACT AMOUNT OF ORDINARY FLOW OF STREAM.—The failure of such judgment to specify in miner's inches, or in any other artificial measure of quantity the amount of water

which must be suffered to flow in the stream before the defendant takes any, does not render the judgment uncertain.

ID.—CONSTRUCTION OF JUDGMENT ON APPEAL—LAW OF CASE.—The construction given to such judgment by this court, in determining the appeal therefrom, becomes the law of the case and binding on the lower court in all subsequent proceedings and whenever its interpretation is material.

ID.—WITNESS NOT HYDRAULIC ENGINEER—EVIDENCE OF MEASUREMENT OF FLOW OF STREAM—CORRECT METHOD OF MEASUREMENT.—It was not error, on the trial of such action, to allow a witness who was not a hydraulic engineer to testify to certain rough measurements he had made of the quantity of water flowing in the stream, where the methods of measurement adopted by him were correct in principle. The weight of such evidence was for the trial court.

ID.—QUALIFICATION OF WITNESS TO MAKE MEASUREMENT—CROSS-EXAMINATION MAY BE LIMITED.—It was discretionary with the trial court to limit the cross-examination of a witness as to his qualifications to make such measurements, when it appeared that he pursued the usual and correct method of measurement.

ID.—ORDER REFUSING NEW TRIAL—NEWLY DISCOVERED EVIDENCE—SUFFICIENT OPPORTUNITY TO HAVE PRODUCED EVIDENCE.—It was not error to refuse the plaintiffs a new trial of such action because of newly discovered evidence concerning the relative elevations of the headgate and the stream, and the physical characteristics of the stream at that point, when the answer, disavowing any claim to the usual flow and claiming only the flood waters, was filed in February, 1909, and the trial was begun in the following December.

ID.—REVIEW OF FINDINGS—AFFIDAVIT USED SOLELY ON NEW TRIAL—MAP NOT IN RECORD.—An affidavit used in the trial court only upon a motion for a new trial cannot be considered on appeal in determining the sufficiency of the evidence to support the findings, and a map which is not in the record at all cannot be considered for any purpose.

APPEAL from a judgment of the Superior Court of Tehama County and from an order refusing a new trial. A. J. Buckles, Judge presiding.

The facts are stated in the opinion of the court.

McCoy & Gans, and Heller, Powers and Ehrman, for Appellants.

Frank Freeman, for Respondents.

SHAW, J.—The plaintiffs appeal from a judgment and from an order denying their motion for a new trial.

Each plaintiff owns a parcel of land which, it is claimed, abuts upon Elder Creek and South Elder Creek in Tehama County. South Elder Creek is a tributary to Elder Creek. The aggregate area of the several parcels is about forty-seven thousand acres. The prayer of the complaint is that the defendants be enjoined from diverting or interfering with the water of South Elder Creek so as to prevent it from flowing down the natural channel thereof to and upon the lands of plaintiffs. The complaint alleges that all the waters of South Elder Creek are required by them for use upon their said lands and are necessary for that purpose, that during the irrigating season they are insufficient to supply said needs and that their lands are also irrigated by the natural seepage and percolation from said stream. It is further alleged that the defendants threaten, intend, and claim the right to take from South Elder Creek a flow of five thousand inches of water, measured under a four-inch pressure, and carry the same to nonriparian land and outside the watershed of said stream, to the injury of the plaintiffs' lands.

The answer denies that "all of the lands" of plaintiffs abut upon the stream, and avers that but a small portion of them "are riparian lands upon and along said stream," and that the waters thereof flow naturally to and upon only a small portion of said lands. It denies that the water of the stream is insufficient, during the irrigating season, for the needs of the respective plaintiffs. It further avers, in effect, that the defendants do not claim, or intend to take, any of the waters of said stream during the irrigating season, or any of the ordinary flow at any season, and that the only claim of defendants is that of the Corning Irrigation Company, which company claims the right to take and intends to take from South Elder Creek the flood waters flowing therein during the months of December, January, February, and March of each year, to the extent of five thousand inches measured under four-inch pressure and no more, and carry the same to nonriparian land outside of the watershed of said stream, to be there used for irrigation and other purposes. It further alleges that during the said months of each year South Elder Creek carries flood waters to the extent of twenty-five thou-

sand inches, and the main Elder Creek twenty-five thousand inches more, all of which flow unobstructed past the lands of the plaintiffs and into the Sacramento River, none of which can be applied by plaintiffs to irrigation, that said flood water is unnecessary for any beneficial purpose or use on their lands, and that if said company does not take the proposed five thousand inches of water, the same would run into the river and serve no useful purpose.

The findings set forth the facts with perhaps unnecessary detail. We give here their substance and effect with respect to the claim of the right to take flood water. South Elder Creek, and Elder Creek below the junction, flow through the lands of the respective plaintiffs. A considerable portion of the lands of each abuts thereon. It is unnecessary to state the exact area of the riparian land. The normal and usual flow of South Elder Creek, including not only the flow in the dry season, but also the usual normal flood waters in the winter or wet season from rains and melting snows, is equal to at least five thousand miner's inches, but this "does not include the waters that come down the stream in times or seasons of unusual freshets and floods from rains and melting snows." The headgate by which the Corning Irrigation Company intends to divert water from South Elder Creek is built in the side of the steep bank thereof with its floor three feet and eleven inches above the bed of the creek at that place. In consequence, the entire usual and normal flow of the stream, as above defined, will flow down the stream and pass the headgate without any of it entering the gate or being diverted thereby. It is not expressly stated in the findings, but the inevitable result of these facts will be that said headgate will not receive or divert any part of the usual or normal flow or of the usual or normal flood waters of the creek, and will not divert or receive any water therefrom except a part of the water that comes down during times of unusual freshets and floods which are sufficient to raise the surface of the stream above the level of the floor of the headgate. The headgate is so constructed that it will divert approximately five thousand miner's inches of the water of the creek when the stream rises to the top of the aperture. The diversion of that quantity of such unusual flood waters during said months will in no wise damage the plaintiffs. At

times during said months there is flowing in said Elder Creek at said headgate a volume of water equal to sixty thousand miner's inches, or more, and the water rises at such times until it is ten feet deep at that point, being six feet above the floor of the headgate. There is not at such times, or at any time, any overflow of South Elder Creek or of Elder Creek, the banks being high enough to confine its waters along its whole course, except near the Sacramento River, where the flood waters are confined by artificial levees. There is no percolation or seepage of water from the creek to the adjacent land. The headgate was constructed by said company in the fall of 1908 for the purpose of thereby diverting five thousand inches of said flood waters during said months of December, January, February, and March, to be conducted to a storage reservoir and used for irrigation on nonriparian lands outside of the watershed of Elder Creek and its tributaries. It was made before this action was begun.

These facts present the question whether or not flood waters, of the character proposed to be diverted from South Elder Creek by the company, may lawfully be taken from the stream for use upon nonriparian lands and outside of the watershed of the stream, without the consent of the riparian owners and without compensating them therefor. In other words, whether the right to have such flood waters flow down the stream in its usual course, under the circumstances here disclosed, is one of the riparian rights attached to lands abutting upon the stream, as parcel thereof, which the owner of such lands may enforce against one who proposes to divert the same to nonriparian lands, where no use is made of such waters on the riparian land and no benefit accrues to riparian land from their passage over the bed of the stream, and no damage is caused to the riparian land from the proposed diversion.

The question is not entirely new in this state. In *Miller* v. *Bay Cities Water Co.*, 157 Cal. 256, [27 L. R. A. (N. S.) 772, 107 Pac. 115] ; *Miller & Lux* v. *Madera etc. Co.*, 155 Cal. 59, [22 L. R. A. (N. S.) 391, 99 Pac. 502], and *Miller & Lux* v. *Enterprise Co.*, 145 Cal. 652, [79 Pac. 439], the question of the right to divert flood waters was considered in cases where the trial court had decided that they formed a part of the regularly recurring flow of the stream during a con-

siderable period of each season, or where it appeared that such flood waters were necessary to supply the gravel strata and artesian basins under the lands of a valley, from which water was obtained to supply the overlying lands. These cases are not parallel to the case at bar. The case of *Anaheim etc.* v. *Fuller*, 150 Cal. 327, [11 L. R. A. (N. S.) 1062, 88 Pac. 978], is cited by the appellant. It does not decide anything at all concerning flood waters. The portion of the opinion in which such waters are mentioned merely declares the rule that a riparian owner may enjoin a diversion of the ordinary flow without a showing of present damage. This is decided in many other cases, but none of them lays down any rule with respect to riparian rights in flood waters such as those involved here.

In *Edgar* v. *Stevenson*, 70 Cal. 286, [11 Pac. 704] ; *Heilbron* v. *Land & Water Co.*, 80 Cal. 194, [22 Pac. 62] ; *Modoc etc. Co.* v. *Booth*, 102 Cal. 151, [36 Pac. 431] ; *Fifield* v. *Spring Valley W. W.*, 130 Cal. 552, [62 Pac. 1054], and *San Joaquin etc. Co.* v. *Fresno Flume Co.*, 158 Cal. 626, [35 L. R. A. (N. S.) 832, 112 Pac. 182], the court was dealing directly with the question of riparian rights in flood waters. The last named case is the latest statement by this court upon the subject. It appears to be direct authority for the contention of the defendants. In that case the defendant, by means of a dam in Stevenson Creek at the foot of a mountain meadow through which it flows, made a reservoir of the meadow, impounding therein the water from the rains and snows falling upon the watershed above, including, necessarily, the water of excessive rains and freshets from melting snows. By this means it made such a salvage of water that after taking from the reservoir and out of the watershed a large and constant stream of water for its own uses, the ordinary flow of the stream was not diminished, but on the contrary was increased, and the stream continued to deliver more than its usual quantity of water to the plaintiffs' lands and diversion works below. One of the plaintiffs was a riparian owner; the other was an appropriator of water from the stream. Thus, it will be seen, the water which the defendant actually took was not water of the ordinary flow of the stream, but was the accumulation of the flood waters flowing in the stream during excessive rains and in the season of the melting snows.

It was of the same character, with respect to the stream, as that which the defendant company proposes to take from South Elder Creek. The opinion gives a careful review of all the cases above cited on the subject. The conclusion is thus stated: "It will be found, therefore, that the decisions of this state not only do not deny the right to the use of storm and flood waters, but encourage the impounding and distribution of those waters wherever it may be done without substantial damage to the existing rights of others." Thereupon the court affirmed the judgment of the court below denying the injunction against the maintenance of the dam and diversion of the water by the defendant. The facts of the Fifield case are also similar to the present case. The defendant there proposed to take only the storm water of the stream flowing therein "during times of extraordinary high water or freshets . . . during and after a rain storm and which are in excess of the ordinary flow," and use it out of the watershed, leaving the ordinary flow to go down the channel undiminished. No damage was caused to the plaintiff's land thereby. It was held that the defendant could lawfully take such water, citing the Modoc case as authority. The Modoc case, though somewhat obscure in its statements, obviously holds that flood waters may be taken for nonriparian uses at times when the flood is so great that the water diverted therefrom could not be used by the riparian owner and the diversion would cause no injury to him or his land and would greatly benefit the appropriator. A similar doctrine is stated in the Edgar case and in the Heilbron case.

These decisions in effect establish the just rule that flood waters which are of no substantial benefit to the riparian owner or to his land, and are not used by him, may be taken at will by any person who can lawfully gain access to the stream, and conducted to lands not riparian, and even beyond the watershed, without the consent of the riparian owner and without compensation to him. They are not a part of the flow of the stream which constitutes "parcel" of his land, within the meaning of the law of riparian rights.

This rule does not conflict with the decisions in the Bay Cities and Miller & Lux cases first above cited. In those cases the water, in question, although in a sense high water, or flood water, was nevertheless a part of the regular and usual

flow of the stream for a considerable part of each year and at a time when such flow was of substantial use and benefit to the riparian lands, or the flow of such waters in their accustomed place was necessary to the gathering of water in subterranean strata from which the owners of overlying land were entitled to take it. The decisions were based on these facts, neither of which exists here, according to the findings.

The judgment declares that the full normal and usual flow of South Elder Creek at defendant's headgate is equal to at least five thousand inches, and that plaintiffs, as riparian owners along the stream, are entitled to have the full, usual, and normal quantity of water of the creek (whether more or less than the five thousand inches, as we understand its terms), flow down the stream by said headgate, including both the usual and normal flow in the dry season and the usual and normal flow in the winter season from rains and melting snow, but not including the additional water that comes down the stream in times of unusual freshets from rains and snows, and that plaintiffs are also entitled to have all other waters of the stream flow therein, except the five thousand inches awarded to the defendant corporation. It then declares that said corporation is entitled to divert and take, during the months above named, by means of its said headgate, for use outside the watershed, five thousand inches of the flood waters of the creek, and no more, after the usual and normal flow to the plaintiff has been provided. There is also a provision that said company shall keep its headgate of its present capacity and as it is now situated with respect to the bed of the creek, and shall maintain the bed of the creek for its entire width of thirty feet at a level at said gate three feet and eleven inches lower than the floor of the headgate, so that there shall flow in said creek past the headgate the usual and normal flow of water before there shall be any diversion of water by said company.

This judgment, in effect, terminates any right or claim the defendants may have had under the notice of May, 1908, or otherwise, to any water of the creek other than the flood waters described. Under the view we take of the law concerning flood waters, as above stated, it is supported by the findings.

In using the term "inches" or "miner's inches" in this opinion, we mean to designate an inch of flowing water, miner's measurement, measured under a four-inch pressure. The findings define the quantity thus indicated, so that there can be no uncertainty in the judgment regarding it. It appears that the defendants, other than said corporation, are its directors, and that they are not otherwise interested.

The complaint was filed on December 8, 1908. According to its allegations the defendant company proposed to take five thousand inches of water of the ordinary flow of the stream, under a notice of appropriation posted in May, 1908, and was proceeding to construct the diversion works therefor, and would complete them and take the water if not restrained. The answer was filed on February 3, 1909. It alleges that the five thousand inches of flood waters, which alone the company intends to take, are claimed under a notice posted in January, 1909, after the action was begun. It denies that the company claimed anything under the notice posted by it in May, 1908. It admits, by failure to deny them, the allegations that for several months before the action was begun the company was actively engaged in the work of diverting the waters of said stream to be used on outside lands, that it posted the notice of May, 1908, and that the same was posted with the intent to claim and take water from said stream thereunder, but it alleges that said work was done to prepare for the claim afterward made by it under said notice of January, 1909, and that it now claims no right except under the last notice.

At the trial the defendant expressly stated that it had abandoned all claim of right or intention to take water under the notice of May, 1908, set forth in the complaint, or to take water at all except under the notice of January, 1909, aforesaid, referring to flood waters only. This entirely eliminated the question of the right and intent of the company to take a part of the usual and ordinary flow of the stream. And as the judgment gives the company no right at all except to five thousand inches of the additional flood waters coming down the stream in unusual freshets from rains and snows, the evidence as to the other water-right once claimed by respondents, and errors of law in admitting or excluding evidence of it, are, for the purposes of this appeal, wholly imma-

terial and harmless, except upon the question of costs, which,
however, the appellants do not mention in their briefs. The
facts that defendants made such a claim before the action
was begun and abandoned it at or before the trial might have
some bearing upon the right of plaintiffs to recover costs of
suit. This is an equitable action in which costs are allowed,
apportioned, or withheld in the discretion of the court.
(Code Civ. Proc., sec. 1025.) The headgate was completed a
month before the action was begun and its position showed
that the ordinary flow would not reach it. Under all the
circumstances we cannot say that the court abused its discre-
tion in giving defendants judgment for costs.

The appellants specify many particulars in which they
claim the evidence is insufficient to support the findings.
They also assign numerous errors of law occurring at the
trial. A large number of these are, for the reasons just
stated, immaterial. We need consider those only which could
in some manner affect the judgment actually given.

It is claimed that the finding that the diversion of the
unusual flood waters proposed by the defendant company
will not damage the plaintiffs is contrary to the evidence.
There was some evidence to the effect that on Elder Creek,
below the defendant's headgate, there is a reservoir site
where, by a dam across said creek, enough water of the flood
and winter season could be caught and stored to irrigate
three thousand acres of land in the driest year and a large
additional acreage in the average years. This site is partly
upon the lands of Gallatin, but chiefly upon the land of others
who are not parties to the suit. If this reservoir were made
and the several plaintiffs should obtain the right to receive
water therefrom, they could irrigate a larger area of their
land than can be irrigated by the natural flow during the
irrigating season. The evidence does not clearly show how
much of their lands are really riparian to the stream. At
the trial it seemed to be conceded that all of it that was
within the watershed of the stream was riparian land to
which the water of the stream was of right attached. In law,
however, only the tracts which border upon the stream are
endued with riparian rights. (*Anaheim etc. Co.* v. *Fuller,*
150 Cal. 627, [11 L. R. A. (N. S.) 1062, 88 Pac. 978].) The
appellants suggest, rather than argue, that by reason of this

possible reservoir site, they, or some of them, may at some indefinite future time determine to construct the necessary dam, and may obtain the right to flood the lands to be covered by the impounded water, and may secure sufficient funds and thereupon build the costly structure and the necessary distributing ditches to use the water on their lands, and that, in that event, they would be entitled to collect, store, and use the unusual flood water of the stream, a part of which is awarded to the defendants by the judgment, that this prospective use is a part of the riparian right and, hence, that a judgment giving an appropriator for nonriparian use flood waters which plaintiffs might thus eventually be able to take and use, is an invasion of their vested rights and necessarily erroneous. It may be doubted whether a possibility so remote as this would be included within riparian rights under any circumstances, or, at least, whether such possibility would justify a court in enjoining the actual use of such flood waters in order to preserve the riparian owner's right to the possibility. But however this may be, if the decisions above cited and the conclusion deduced therefrom that such flood waters do not come within the protection of the law of riparian rights be correct, it is obvious that this argument or suggestion is of no force. The precise area of the plaintiffs' lands which are actually riparian is not of importance to the decision of the case. It appears from the findings and also from the evidence that there is a sufficient quantity of it to give them a standing as riparian owners upon the stream and to entitle them to enforce all the rights belonging to such owners. The rights of riparian owners are paramount to those of an appropriator under the Civil Code. As riparian owners they were entitled to enjoin the taking by the defendants of any water which belonged to them as riparian owners or which would injure or destroy their riparian rights. Our conclusion that the water which the defendants propose to take does not pertain to the riparian right makes the evidence concerning the recording of the notice of January, 1909, and as to the exact amount of riparian land, immaterial to the judgment, and errors in relation thereto require no consideration, as they could not operate to the prejudice of the appellants. This also applies to the evidence or lack of evidence of the fact that the defendant

proposes to apply the water to a useful purpose. It does
appear that they propose to use it to irrigate land outside
of the watershed of the creek. But as the plaintiffs have no
right to the unusual flood waters it is immaterial to them
whether the defendants use it or not.

It is also claimed that the evidence is insufficient to show
that there was no percolation or seepage of water from the
creek which benefited the riparian land. The evidence on
this subject was conflicting. There was sufficient evidence to
prove the fact, and, hence, the decision of the trial court is
conclusive on appeal. On this point, however, it may be said
that there was ample evidence from which the court might
well have concluded that the water to be taken by the de-
fendant would have no appreciable effect upon such seepage
or percolation as may occur, and that its flow down the
stream would not in that manner benefit the plaintiffs' lands.

The description of the condition and size of the bed of the
creek at and about the headgate, as given in the findings,
may not be entirely accurate. It is difficult to describe such
conditions in words so as to make them entirely clear. The
essential finding in this regard is that the headgate is situated
at such a height above the stream that it will not divert any
water therefrom excepting during the unusual floods and
freshets mentioned. The judgment requires the bed of the
creek to be kept in such condition that it will never take
any other water, and it specifies the width and depth at
which the channel of the creek is to be maintained for that
purpose. This will sufficiently protect the plaintiffs against
the taking of the ordinary flow and ordinary flood waters.
The accuracy of the description in minor details is therefore
unimportant. It is said that there is no line of demarcation
shown, either by the evidence or the findings, between the
ordinary and usual flow of flood waters and the extraordinary
and unusual flow from which the defendants are entitled to
take. In the nature of things this must be so. In course
of time there will be every degree of variation in this flow.
In general the fact seems to be that the stream rises in the
mountains and the bed thereof runs upon a considerable
grade until it reaches a point about twelve miles from the
Sacramento River. Down this steep grade in the winter
season the water flows with great velocity and at considerable

volume.   During ordinary rains and for a considerable time
between such rains it carries what may be called the usual
and ordinary flood water, but at the time of any hard rain
and for a short period thereafter very large additions are
made to the water in the stream, and these are carried on
to the river without contributing anything whatever in the
way of benefit to the lands of the plaintiff's or any other
person.   It is a part of this water which the defendant com-
pany proposes to take and which the judgment awards to it.
It is clear from the evidence that the amount proposed to
be taken will  seldom include all of  this flood water and
frequently not even a large proportion of it.   We think
the evidence sufficiently sustains the finding of the court that
five thousand miner's inches will include all of the ordinary
and usual flow of flood waters during the winter season, but
the finding as to the exact number of inches is immaterial.

A witness who was not a hydraulic engineer was allowed
to testify to certain rough measurements he had made and
caused to be made of the quantity of water then flowing in
the creek.   It is claimed that he was incompetent to testify
upon such matters.   We think the ruling admitting the evi-
dence was not erroneous.   His methods were correct in prin-
ciple, that is, he took the speed of the current and the width
and depth of the stream at the point of measurement and
from that calculated the quantity.   The result was not as
accurate as a more precise and complete measurement would
have given, but it furnished some evidence of the quantity
and its weight was for the trial court to determine.   The
cross-examination of the witness Jewett as to his qualifications
to make such measurements was, perhaps, too much restricted,
but it appears that he pursued the usual and correct method
of measurement.   He measured sufficiently to ascertain the
area of a cross-section of the creek, he put a bench mark on
the bank from which the altitude of the surface of the water
could be readily ascertained at any time, and he ascertained
with fair accuracy the speed of the current at that place.
It does not appear that the court was required to allow an
extended cross-examination on such a subject.   The extent of
cross-examination is a matter within the sound discretion of
the trial court.

With regard to the contention that a new trial should have been ordered because of newly discovered evidence concerning the relative elevations of the headgate and the creek and the physical characteristics of the creek at that point, it is sufficient to say that the answer, disavowing any claim to the usual flow and claiming only the flood waters, was filed in February, 1909, and that the trial began in December, 1909. The evidence could not be deemed newly discovered, since there was ample time within which the plaintiffs might have ascertained all of these facts before the trial.

Many other objections were made in the course of the trial which are assigned as error. In view of the conclusions we have reached concerning the respective rights of the parties in the flood waters the greater number of these are wholly immaterial. Of those remaining we have mentioned the only ones which we deem of sufficient importance to justify remark.

The judgment and order are affirmed.

Angellotti, J., and Sloss, J., concurred.

Hearing in Bank denied.

Beatty, C. J., dissented from the order denying a hearing in Bank.

In response to an application by the plaintiffs for a modification of the judgment the following opinion was rendered by Department One on September 4, 1912:—

SHAW, J.—After the opinion herein was filed the plaintiffs applied to have the judgment of this court and the court below modified. They claim that the judgment of the lower court is so uncertain in its terms that if left unmodified there is danger that it may be understood to permit the defendant company to take a part of the ordinary flood flow of the stream.

The findings state, in effect, that the defendant's headgate is forty-seven inches higher than the bottom of the creek at that point, and that at that comparative elevation (and this is the controlling fact) it will not divert any of such ordinary flood water; in other words, that it is only the occasional and unusually high floods which are high enough to enter

the gate at such elevation, and that when such flood does so enter there will be a quantity flowing down the creek and passing the headgate equal to the ordinary flood flow thereof. There is substantial evidence to support this finding and hence we not only cannot set it aside, but must accept it as fact. Hence, under present existing conditions as the findings state them, the defendant cannot divert any of the ordinary flow or usual flood water.

The third paragraph of the judgment provides that said corporation defendant "shall provide for the permanent maintenance of the said headgate under the present existing conditions and for the present capacity of said creek at the said headgate . . . so that there shall flow in said creek past said headgate the usual and normal flow of the waters of said creek at said point, as herein defined (i. e., including usual flood waters), before there shall be any diversion of flood waters by defendant corporation."

If this is done and the findings are true, as we must presume, the plaintiffs will be perfectly protected in their right to the usual flow and ordinary flood waters. It is in the nature of a mandatory injunction. The defendant corporation and its officers, agents, and employees will be subject to punishment for contempt if they disobey it. The provision applies to and safeguards against changes of conditions from any cause, natural as well as artificial. If, for example, a flood should fill in the bed of the creek with rocks at that point so that a part of the ordinary flood water would enter the gate, or so that water would enter it at a lower stage than under present conditions, the defendant could be compelled to refrain from diverting any water at all until it had restored the creek to the same condition, with respect to its capacity to carry water past the gate, as that in which it was at the time the judgment was rendered. An artificial change would entail the same consequences.

It is suggested that it is uncertain because it does not specify in miner's inches, or in any other artificial measure of quantity, the amount of water which must be suffered to flow in the creek before the defendant takes any. The number of miner's inches is not the criterion given by the judgment, but it is certain nevertheless. The existing conditions, whether expressly stated or not, that is, the comparative ele-

vations of the creek-bed and the floor of the gate, the various natural widths and grades of the creek at and near the gate, the directions of its course, and the roughness and irregularities of its bed at all places near enough to the gate to affect its capacity at that point, absolutely determine its carrying capacity at that point. These conditions the defendant must preserve and so long as they remain the same the capacity will remain the same.

The reference in the first paragraph of the judgment to the usual and normal flood-waters as a ''volume of water equal to at least 5000 miner's inches,'' does not adjudge that quantity to be the usual flow. It is obviously a mere estimate of the minimum. It proceeds to adjudge that it means all that the creek will carry when the surface is as high as the floor of the headgate, with the creek there thirty feet wide and forty-seven inches below said floor, whether more or less than five thousand inches. Counsel express a fear that the judgment may be so interpreted hereafter by the court below as to give the defendant greater rights than it gives as we construe it. The construction given to a judgment of the lower court by this court, in determining an appeal therefrom, constitutes the law of the case and is binding on the lower court in all subsequent proceedings and whenever its interpretation is material.

Appellants also quote statements from an affidavit used in the court below only upon a motion for a new trial and they present a map which is not in the record at all, all of which as they claim tends to show that the findings as to the width, depth, and carrying capacity of the creek under the level of the headgate, are incorrect, and that it will in fact carry much less than five thousand inches and less than it would carry if the stated width and elevations were correct. The map cannot be considered for any purpose. The affidavit cannot be considered in determining the sufficiency of the evidence to support the findings.

Under all the circumstances, we do not think any modification of the judgment is necessary to protect the plaintiffs in the rights which are awarded to them therein.

Sloss, J., and Angellotti, J., concurred.