[Civ. No. 4468. Second Appellate District, Division Two.—July 16, 1925.]

SAMUEL DELANNOY et al., Appellants, v. ALFRED QUETU et al., Respondents.

[1] APPEAL—FINDINGS—EVIDENCE—INFERENCES.—In reviewing a record presented upon appeal and in examining the sufficiency of the evidence to support a questioned finding, the appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion.

[2] TRUSTS — TRANSFERS OF CORPORATE PROPERTY — CONSIDERATION — FINDING—EVIDENCE.—In this action to establish the fact that one of the defendants was holding title to certain lands in trust for the benefit of the stockholders and creditors of a foreign corporation which had forfeited its right to do business, and to have a receiver appointed, there was no evidence warranting a finding to the effect that another of the defendants, who had formerly owned a certain ranch, caused said ranch to be conveyed to said corporation, and subsequently to be disposed of, without consideration.

1. See 2 Cal. Jur. 880.

[3] Id.—CORPORATIONS—RECEIVERS—SECTION 565, CODE OF CIVIL PROCEDURE.—Section 565 of the Code of Civil Procedure, relating to the appointment of a receiver or trustee of a corporation upon dissolution, has no application to the instant action, where the action was not commenced for the purpose of effecting the dissolution of the corporation, where plaintiffs were not then stockholders, where there were no creditors, and where the property described in the complaint was no longer subject to an action against said corporation or its former stockholders.

[4] Id.—RECEIVERS—SUBDIVISION 7, SECTION 564, CODE OF CIVIL PROCEDURE.—In such action, the issues as to the alleged ownership by the plaintiffs of the properties alleged to have been alienated by the corporation without consideration, the reconveyance and distribution to them of such properties, and the appointment of a receiver, were properly triable in any county wherein the corporation was alleged to have owned or been entitled to real property, by virtue of subdivision 7 of section 564 of the Code of Civil Procedure, which provides that a receiver may be appointed by the court "in which an action is pending . . . in all other cases where receivers have heretofore been appointed by the usages of courts of equity."

[5] Id.—STOCK HELD AS SECURITY—ACCEPTANCE OF PROPERTY—SURRENDER OF SECURITY "IN FULL SETTLEMENT."—In such action, adopting the theory that the plaintiff husband received stock in the corporation merely as security for the moral obligation on the part of one of the defendants (who caused the corporation to be organized and to whom all the stock had originally been issued for a ranch) to pay the plaintiff wife her share in her mother's estate which had been entrusted to said defendant for investment purposes, which investment proved to be a loss, the plaintiffs, by their acceptance of real property which was caused to be conveyed to them by said defendant, and their surrender of such security "in full settlement," were precluded from successfully seeking other equitable relief.

[6] Id.—TRANSFER OF STOCK—PARTIES.—In such action, assuming that the plaintiff husband was the legal owner of shares of stock of the corporation, he was estopped from maintaining the instant action, where he had accepted real property from one of the defendants, and to all intents and purposes had transferred his stock, regardless of a failure to have the same entered upon the books of the corporation, divesting himself of all interest in the corporation.

3.  See 7 Cal. Jur. 188.

[7] ID.—CORPORATIONS—ASSIGNMENT AND DELIVERY OF CERTIFICATE—TITLE.—Regardless of the emphatic requirements of the statute, by-laws or charter, requiring that transfers of stock be entered on the books of a corporation, an assignment and delivery of certificates effectually estops the transferor from claiming any title to the stock so transferred.

[8] ID.—CONVEYANCES OF REAL PROPERTY—VALIDITY OF—RECEIVERS.—The instant action having been based upon the theory that a receiver or trustee should be appointed to take charge of and distribute the real property described in the complaint, and no irregularity in the transfers of such property having been established, none of said property is held by, or in trust for, the corporation, of which a receiver or trustee might be appointed.

[9] ID.—ERRONEOUS FINDING—FAILURE TO FIND—WHEN NOT GROUND FOR REVERSAL.—An erroneous finding, or a failure to find, which does not affect the judgment rendered is not a ground for reversal.

[10] ID.—ORDER DENYING NEW TRIAL—APPEAL.—There is no right of appeal from an order denying a motion for a new trial; and an appeal from such an order will be dismissed.

[11] ID.—EVIDENCE—FINDINGS—APPEAL.—In passing upon the question of the sufficiency of the evidence to support a finding, the appellate court's duty begins and ends with the inquiry whether the trial court had before it evidence upon which an unprejudiced mind might reasonably have reached the same conclusion which was reached. (On denial of rehearing.)

---

(1) 4 C. J., p. 777, n. 61. (2) 39 Cyc., p. 633, n. 21. (3) 14a C. J., p. 964, n. 56 New. (4) 14a C. J., p. 963, n. 53; 34 Cyc., p. 18, n. 24. (5) 39 Cyc., p. 633, n. 21. (6) 14 C. J., p. 679, n. 39, p. 680, n. 45. (7) 14 C. J., p. 675, n. 82, p. 679, n. 39, p. 680, n. 45, p. 753, n. 71. (8) 39 Cyc., p. 633, n. 21. (9) 4 C. J., p. 1057, n. 85, p. 1060, n. 13. (10) 3 C. J., p. 507, n. 61; 4 C. J., p. 878, n. 82. (11) 4 C. J., p. 886, n. 43.

APPEAL from a judgment of the Superior Court of San Bernardino County. *J. W. Curtis,* Judge. Affirmed.

The facts are stated in the opinion of the court.

Walter Eden and E. J. Miller for Appellants.

---

7. See 6 Cal. Jur. 790; 7 R. C. L. 268.
9. See 2 Cal. Jur. 1028, 1033; 2 R. C. L. 243.
10. See 20 Cal. Jur. 213.
11. See 2 Cal. Jur. 935.

J. Wiseman MacDonald and W. W. Wallace for Respondents.

CRAIG, J.—Early in the year 1909 the respondent Alfred Quetu, a native of France, who had for many years resided in California, owned an option to purchase a ranch consisting of about 400 acres, in Orange County. In the month of May of said year he visited his mother, Hermance Quetu, and his brothers and sisters, all of whom were then residing in France. During his stay abroad his mother delivered to him 60,000 francs for investment in this country, and which he testified that he did invest in Arizona mining property. It appears that Quetu, upon his departure for the old country, had left a foreman by the name of Butler in charge of the ranch, and that prior to his return he paid for the same through Butler. During his visit abroad Quetu advised the plaintiff Julienne Delannoy, a sister, and her husband, Samuel, as he did Frank Dupre, a cousin, and Augustin Quetu and Gabrielle Quetu, a brother and sister, respectively, to come to America; previously to Alfred Quetu's return they came here, and all commenced to live and work upon the Orange County ranch. The five immigrants continued working together on said ranch until each was allotted possession of a portion thereof, which respondent Alfred Quetu testified was thereafter operated for him on a profit-sharing basis. At some time after Alfred Quetu purchased said property he mortgaged the same as security for the repayment of $45,000 which he testified he was compelled to borrow when forced to pay a note which he indorsed for another party. On April 24, 1914, he incorporated the Valencia Ranch Company, under the laws of the state of Arizona, with Phoenix designated as the principal place of business, and the said Alfred Quetu, Samuel Delannoy and Augustin Quetu were named in the articles of incorporation as directors. On June 3, 1914, said ranch property, described as consisting of 407.1 acres, was deeded by Alfred Quetu to the corporation, for which he testified that all of the capital stock, of the par value of $1 per share, was issued to himself. There were 300,000 shares of authorized capital stock, 30,000 shares (the stock-books actually indicated 31,000 shares) of which were thereafter caused to be

reissued to Samuel Delannoy, and the other parties also received various amounts thereof. On January 29, 1915, copies of said articles were filed with the Secretary of State in California, and with the clerk of Orange County, the principal office and place of business in this state being situated at or near San Juan Capistrano, in said county.

It appears that on March 27, 1915, the Valencia Ranch Company deeded to A. J. Visel and others 50.457 acres of said ranch lands; on March 22, 1916, said corporation deeded to the same grantees 333.03 acres thereof; on March 27, 1915, Visel and his cograntees deeded to the corporation certain lands in the county of Riverside, which on August 24, 1915, said corporation deeded to one White, who, in turn, conveyed the same to the defendant Gabrielle Quetu on March 9, 1916; and on May 17, 1916, one Carrie Williamson and her husband conveyed to the plaintiff Samuel Delannoy two lots at Downey, in Los Angeles County.

Appellants instituted this action in San Bernardino County on June 16, 1920, alleging that at some time subsequent to March 27, 1915, the corporation exchanged the Riverside property for lands in San Bernardino County, which latter the defendant Alfred Quetu had caused to be deeded to his sister, Gabrielle, without consideration. Appellants contend that Alfred Quetu while in France promised them that if they would come to America and work on the Orange County ranch, and help "pay it off," he would give them a one-third interest therein; that after Delannoy had complied with his part of such alleged agreement and the corporation had acquired said property, it forfeited its right to do business in California, and that the defendants Alfred Quetu and Augustin Quetu, former directors, are sued as trustees of the property of the corporation, together with Gabrielle Quetu, to whom the San Bernardino property is alleged to have been conveyed at the instance of the defendant Alfred Quetu. The complaint demands that a decree be entered adjudging that the defendant Gabrielle Quetu holds title to said last-mentioned lands, and to the Riverside property, in trust for the stockholders and creditors of the corporation; that a trustee be appointed in lieu of the directors who held their offices as such at the time said corporation forfeited its California rights; that the Riverside and San Bernardino properties be restored to the

corporation, and that such trustee account for the rents, issues and profits thereof, and close up the affairs and distribute the assets.

The defendants denied that plaintiffs were promised any interest in said property, or in the corporation, and denied that any of the property was conveyed to or by the corporation without consideration; it is contended by them that Alfred Quetu suggested that plaintiffs could make more money in America than in France, and that if they desired to work on his ranch he would pay them for their services; that he and the corporation did pay the plaintiffs for all such services, and advanced other moneys to them, until 1911, when they commenced working a portion of the ranch on shares; and the defendants also pleaded the statute of limitations, of frauds, and insist in their briefs that the superior court of San Bernardino County had no jurisdiction of the suit because section 565 of the Code of Civil Procedure requires that the appointment of a receiver or trustee of a foreign corporation be made in the county in which the corporation maintains its office and principal place of business.

The trial court found for the defendants upon all grounds set forth in their answer, and the plaintiffs appeal, asserting that the evidence was not sufficient to support the findings or the judgment based thereon.

[1] Much of the evidence in this case is not contradicted, but we are bound by the rules heretofore announced by the supreme court in reviewing a record presented upon appeal, and "in examining the sufficiency of the evidence to support a questioned finding, . . . must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion." (*Bancroft-Whitney Co.* v. *McHugh*, 166 Cal. 140 [134 Pac. 1157].) As expressed also in *Woodward* v. *Glenwood Lumber Co.*, 171 Cal. 513 [153 Pac. 951]: "We must be understood to be setting forth the evidence, in so far as it is conflicting or subject to opposing inferences, in the light most favorable to the support of the judgment under review. This is the light in which the evidence must be deemed to have been regarded by the court below, and

represents, therefore, that view of the facts which is binding on this court on appeal.''

It appears that Alfred Quetu's investment of his mother's money in the Arizona project was ill-advised, and that her funds were lost, but that she passed away shortly thereafter. and her estate was not probated; that while he did not consider the plaintiffs or his codefendants legally entitled to any portion of the ranch, or to an interest in the corporation, he did believe that except for the loss suffered through the Arizona investment, each of them would have received a share of his mother's estate, and that he should protect them. Quetu testified that he at no time agreed to give any of the parties an interest as the plaintiffs alleged, and that they were fully compensated for all their services; that Gabrielle Quetu invested money in the Orange County ranch and continuously worked thereon, much of the time without wages or other compensation, until the property was sold and the Riverside ranch was deeded to her in March, 1916. It was shown that previously to Alfred Quetu's return to America he completed paying for the Orange County ranch, and that nothing remained to be "paid off," as plaintiffs contended it was part of the agreement that they should assist in accomplishing. Some time after Quetu's return he mortgaged said property for the sum of $45,000, but he testified that this was necessary in order to raise sufficient funds with which to meet a promissory note which he had indorsed for another person, not a party to this suit.

The fact is in evidence that although plaintiffs assert that Quetu controlled the affairs of the corporation, and dictated all transactions, none of which was understood by them, he discussed all business matters with them in the French language, before any important action was taken, and that all corporate acts were voted upon and authorized by the full board of directors, with the complete understanding and acquiescence of all the parties concerned.

[2] Despite the contention of appellants that Alfred Quetu caused the Orange County ranch to be conveyed to the corporation, and subsequently to be disposed of, without consideration, we find no evidence that would warrant a finding to such effect. The property in Orange County, as heretofore stated, was conveyed by the Valencia Ranch Company to Visel and others in 1915 and 1916, and the latter con-

veyed Riverside County property to the corporation in 1915; both 1915 transfers were dated March 27th. The property received by the corporation in 1915 was situated near Hemet, California, and was subsequently exchanged for a one-half interest in a ranch near Loma Linda; the 1916 conveyance was made in exchange for the remaining half of said Loma Linda ranch, all of which was deeded by the corporation to Ben White by deed dated August 24, 1915, and on March 9, 1916, this latter property was conveyed by White to Gabrielle Quetu. In May, 1916, Alfred Quetu purchased and caused to be conveyed to the Delannoys a residence and orange grove near Downey, in Los Angeles County, which they accepted subject to a mortgage, and moved thereon. It was testified that when the plaintiffs left Orange County they also received and took with them to the Downey property household furniture, farming implements and five valuable imported Belgian horses that had belonged to Alfred Quetu.

It affirmatively appears that the expense of operation, together with interest on the $45,000 mortgage, rendered the burden of maintaining the corporation unprofitable, and that all the parties interested therein after united consultation decided that it should be dissolved and the property disposed of, which was done, as we have indicated above. All the outstanding certificates of capital stock were indorsed by the various holders thereof, including appellants, and were delivered back to Alfred Quetu, who testified that as soon as he was advised both from Sacramento and from Phoenix, Arizona, that the corporation had been finally dissolved, he destroyed the entire issue, though it does not appear that the surrender and transfer was entered upon the books of the corporation.

The trial court found "it is not true that plaintiffs had any agreement of any kind or character to help Alfred Quetu pay for said ranch, but it is true that said ranch was fully paid for by the said Alfred Quetu prior to the time that the plaintiffs came to America"; and as a conclusion of law it was determined that the defendants were not indebted to the plaintiffs or either of them in any sum whatsoever; that the plaintiffs were not entitled to an accounting of the rents, issues or profits of the real property

described in the complaint, and that there was no necessity for the appointment of a receiver or trustee.

It was testified that when Quetu caused the Downey ranch to be conveyed to the plaintiffs he informed them that they must accept the same in full satisfaction of any claims they might have, and that they replied "all right," and that Delannoy thereafter said, "I understand that you are not obliged to furnish us any more property since we have accepted the Downey property in full settlement."

Appellants assign many grounds upon which they seek a reversal of the judgment below.

[3] The respondents urged that the trial court was without jurisdiction of the action for the reason that section 565 of the Code of Civil Procedure required suits for receiverships to be instituted in the county where the corporation maintained its office and principal place of business. Said section provides that "Upon the dissolution of any corporation, the superior court of the county in which the corporation carries on its business or has its principal place of business, on application of any creditor of the corporation, or of any stockholder or member thereof, may appoint one or more persons to be receivers or trustees of the corporation, to take charge of the estate and effects thereof, and to collect the debts and property due and belonging to the corporation, and to pay the outstanding debts thereof, and to divide the moneys and other property that shall remain over among the stockholders or members." It was not alleged nor attempted to be shown that the defendant corporation when in existence did business in the state of Arizona, or had an office or filed its articles in any California county other than Orange County. From what has been said, however, it becomes manifest that the section in question does not here apply. Appellants' suit was not commenced for the purpose of effecting the dissolution of the corporation, they were not then stockholders, and there were no creditors; and, as we have indicated, we are of opinion that the property described in the complaint was no longer subject to an action against said corporation or its former stockholders.

[4] We think, however, that the issues presented were properly triable in any county wherein the corporation was alleged to have owned or been entitled to real property, by

virtue of subdivision 7 of section 564 of the Code of Civil Procedure, as argued by the appellants. It is there provided that: "A receiver may be appointed by the court *in which an action is pending,* or by the judge thereof: . . . 7. In all other cases where receivers have heretofore been appointed by the usages of courts of equity." Respondents apparently unduly stress the importance of the receivership in these proceedings, which were instituted, not primarily for the purpose of dissolving the corporation, or marshaling the assets of its estate, but praying a decree that the plaintiffs were the owners of properties alleged to have been alienated by the corporation without consideration, and that it be reconveyed and distributed to them, as an incident to which result a receivership would have been appropriate had appellants established the facts as they alleged them to exist.

In *Conliffe* v. *Consumers' Assn.,* 280 Pa. 263 [32 A. L. R. 1348, 124 Atl. 501], the Pennsylvania supreme court, in discussing the question here presented, said:

"It would seem strange to say that the courts of Pennsylvania have no jurisdiction to appoint a receiver for a corporation where all of the assets, all of the business, all of the officers and directors, and all of the books and records of the corporation, are in this state, merely because the promoters of the corporation for some purpose went to another state to have the company incorporated."

In *Acken* v. *Coughlin,* 103 App. Div. 1 [92 N. Y. Supp. 700], applying the same rule upon the authority of previous like holdings, it was said:

"The courts of this state, at the suit of an officer, director, stockholder, or creditor of a foreign corporation, have jurisdiction to compel the officers or directors of the corporation, over whom jurisdiction has been acquired by the service of process, to account to the corporation for property of the corporation in their hands, or which they have misapplied."

This rule is generally recognized, that courts have jurisdiction to appoint receivers for the purpose of preserving assets *pendente lite.* (*McAtamney* v. *Com. Hotel Constr. Co.,* 296 Fed. 500; *National Guar. Credit Corp.* v. *Worth & Co.,* 274 Pa. 148 [117 Atl. 914]; *Starr* v. *Bankers Union,* 81 Neb. 377 [129 Am. St. Rep. 684, 116 N. W. 61]; 5

Thomp. on Corp., sec. 6861; 3 Cook on Corp., 5th ed., sec. 865.)

But there are at least three of the more prominent features presented by the record, either one of which would require an affirmance, to which we shall devote attention, namely: (1) Upon the theory that Samuel Delannoy received stock in the corporation merely as security for the moral obligation to pay his wife her share in her mother's estate, we think that if appellants possessed any legal claim it was fully satisfied by the conveyance to them of the Downey ranch; (2) assuming that Delannoy was the legal owner of said shares of stock, he accepted the real property, and to all intents and purposes transferred his stock, regardless of a failure to have the same entered upon the books of the corporation, divesting himself of all interest in the corporation; and (3) the action having been based upon the theory that a receiver or trustee should be appointed to take charge of and distribute the real property described in the complaint, and no irregularity in the above-mentioned transfers having been established, none of said property is held by, or in trust for, the corporation, of which a receiver or trustee might be appointed.

[5] Accepting the evidence in support of the findings and judgment below as true, appellants received $250 during the first three or four months after their arrival in California, and were paid each month thereafter for their services. When they commenced operation of a portion of the Orange County ranch on shares, they also received the amount of proceeds due them after the payment of taxes, interest and other expenses. Up to the time of their removal therefrom, therefore, no unpaid balance remained due them for their share of the labor and management of said property. Thereafter, assuming that they held said stock as security, it is obvious that upon acceptance of the Downey property and surrender of such security "in full settlement," they were no longer entitled to demand a further consideration for the same obligation, whether it be a moral or legal one, on the part of Alfred Quetu. It was not claimed by appellants, nor was there any showing attempted to be made by them, that Alfred Quetu was legally indebted to them on account of the loss of moneys invested

by him for the mother; on the contrary, it does appear that Quetu had never agreed to pay them any amount in behalf of said estate, and that Hermance Quetu gave him the funds without restriction, to invest as he might desire; and he testified that he had returned to her a considerable amount of her money previously to her demise. However, it is conceded by the respondents that Alfred Quetu may have assumed at least a moral obligation to divide the portion of the estate which was entrusted to him, and adopting such theory for the purposes of this case, we think appellants were precluded by their acceptance of the Downey property from successfully seeking other equitable relief.

[6] If it be said that Delannoy was the legal owner of 31,000 shares of the stock of said corporation, and that as such he should be entitled to one-tenth of its property upon the forfeiture of its right to do business in this state, and its dissolution in the state of its creation, he was not such stockholder at the time this suit was instituted: He was therefore estopped to maintain such an action, as a stockholder, and it does not appear that there were any creditors of the corporation. [7] It has been repeatedly held in most jurisdictions, including our own, that regardless of the emphatic requirements of the statute, by-laws or charter, requiring that transfers of stock be entered on the books of a corporation, an assignment and delivery of certificates effectually estops the transferor from claiming any title to the stock so transferred. (4 Thomp. on Corp., 2d ed., sec. 4355.)

Section 324 of the Civil Code expressly provides that as to the *parties* shares of corporate stock "may be transferred by endorsement by signature of the proprietor, his agent, attorney, or legal representative, and the delivery of the certificate." An alleged gift of the capital stock of a corporation, without consideration, was involved in *Calkins* v. *Equitable B. & L. Assn. of the United States,* 126 Cal. 531 [59 Pac. 30]. One Daniel Calkins assigned certain certificates of stock to F. G. Calkins and others, which were thereafter under his instructions held by the assignees without notice to or transfer upon the books of the corporation. Upon the death of the assignor the assignees presented said stock to the corporation for transfer upon its books, which was refused, whereupon they brought an action for the purpose of

obtaining a mandatory decree directing such transfer; the executor of Daniel Calkins' estate intervened, claiming that the attempted assignment was void. Judgment was rendered in favor of the plaintiffs, and from such judgment and an order denying a new trial the intervener appealed. The supreme court, after reciting the facts, and following the quotation of section 324 of the Civil Code, said:

"Everything necessary to a complete transfer of the stock, as between the parties, was found by the court to have been done by them in the lifetime of Daniel Calkins, and it is also found that these things were done with the intent to make a present transfer, and not with the intent to make a testamentary disposition. We think these findings are fully warranted by the evidence, and that the conclusion of the trial court that a valid transfer of the stock was effected is fully supported. . . . The gift and transfer of the stock was accomplished by the written assignment and delivery of the stock with the intention to make a gift thereof to plaintiffs. The donor thereby gave up to plaintiffs the title and control of the stock, and he could not thereafter revoke the gift."

The same rule was announced and applied in *Pacific Nat. Bank* v. *Western Pac. R. Co.,* 157 Cal. 573 [21 Ann. Cas. 1391, 27 L. R. A. (N. S.) 987, 108 Pac. 676], *Spreckels* v. *Nevada Bank,* 113 Cal. 272 [54 Am. St. Rep. 348, 33 L. R. A. 459, 45 Pac. 329], and *Strout* v. *Natoma Water etc. Co.,* 9 Cal. 78.

In *Riverside Land Co.* v. *Jarvis,* 174 Cal. 316, 327 [163 Pac. 54], it was said, that the provisions of section 324 of the Civil Code are not exclusive, and that "This language does not forbid the making of agreements to transfer, nor the making of contracts, good between the parties, that a certificate shall pass with the transfer of certain other property. Corporate stock would be transferable without such provision. (Civ. Code, sec. 1044.) The provision merely prescribes a mode by which the transfer may be made. It does not prohibit a transfer by other methods, nor declare that when made in another manner a transfer may not be enforced by the party entitled to the shares." *Young* v. *New Pedrara Onyx Co.,* 48 Cal. App. 1, 15 [192 Pac. 55], citing the case last mentioned herein, held "that a transfer of title, good as between the parties, may be made in any

manner appropriate to the assignment of choses in action or intangible personal property.''

The obvious conclusion therefore follows that, although the record does not disclose the exact date of Delannoy's transfer to Quetu of the 31,000 shares of stock previously received, it appears that long before this suit was begun he parted with all his right, title and interest in said shares by a legal present assignment and delivery of the certificates. The appellants having disposed of their stock, for a consideration which we think was ample, they were therefore not stockholders when this action was instituted, and were not, as such, entitled to recover, or in fact to maintain the suit.

[8]   The third, and most strenuously urged, ground upon which appellants founded their asserted right to recover, is, we think, likewise without merit. As we have shown, the corporation parted with its Orange County properties, and the lands in suit were conveyed to Gabrielle Quetu for a sufficient consideration to preclude the corporation or its representatives from reclaiming them. It is the positive testimony of some of the witnesses that she invested her money in the corporate enterprise, and that she labored during many years in its interest, without compensation other than the final conveyance to her of the lands in controversy upon abandoning the Orange County lands and the surrender of her corporate stock in the manner and with the intent which accompanied the Delannoy settlement. No fraud was shown to have entered into any of the transfers, nor does the evidence disclose any apparent dissatisfaction of appellants with their settlement at the time it was consummated, though it does appear that following their unequivocal admission that their claim, if any they had, was fully adjusted with Quetu, they later reconveyed the property which they had accepted to the original vendor; that they then pressed Quetu with further demands, whereupon he again and again at no little effort and expense attempted to pacify them, but without success. We are convinced from the evidence here presented that appellants not only failed to establish any legal or equitable claim against Quetu or the corporation, but that their contention that the properties described in their complaint belonged to the corporation, or were held in trust by Gabrielle Quetu there-

for because of illegal transfers, is without foundation. And this being true, the subject matter of the attempted receivership did not exist; hence, in the absence of corporate or trust property, the appointment of a receiver or trustee would have been an idle act, which the courts cannot be called upon to perform, and there was no cause of action.

[9] A number of the findings are attacked as not being supported by the evidence, and in several instances this criticism is justified, for instance: That the plaintiff Samuel Delannoy was not called upon to act as an officer of the corporation; that Alfred Quetu did not sell the crops; and that the plaintiff Samuel Delannoy never was a stockholder of the corporation. But from the view we take of other legal questions involved, it is not necessary to consider these assignments of error. Although such findings are contrary to the evidence and erroneous, we think that correct findings in these respects would not alter the result reached by the court below, if the judgment appealed from were reversed and the same evidence adduced upon a new trial. Such errors must therefore be disregarded, since an erroneous finding, or a failure to find, which does not affect the judgment rendered is not a ground for reversal. (*Hall* v. *Crowley*, 12 Cal. App. 30 [106 Pac. 426]; *Ramboz* v. *Stansbury*, 13 Cal. App. 649 [110 Pac. 473]; *Forestier* v. *Johnson*, 164 Cal. 24 [127 Pac. 156]; *Gallatin* v. *Corning Irr. Co.*, 163 Cal. 405 [Ann. Cas. 1914A, 74, 126 Pac. 864]; *McRae* v. *Ross*, 170 Cal. 74 [148 Pac. 215]; *Eastman* v. *Piper*, 68 Cal. App. 554 [229 Pac. 1002].)

The judgment below is affirmed.  [10] There is no right of appeal from the order denying motion for new trial, and the appeal from such order is, therefore, dismissed.

Finlayson, P. J. and Works, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on August 14, 1925, and the following opinion then rendered thereon:

CRAIG, Acting P. J.—On motion for rehearing.

The judgment of the superior court herein having been affirmed, appellants petition for a rehearing, and assign two grounds upon which they assert that it should be granted.

It is said, first, that the opinion of this court was founded principally upon the fact that after Delannoy became a stockholder of the Valencia Ranch Company he redelivered to Quetu his stock in consideration for property situated at Downey and that Delannoy, therefore, was no longer a stockholder and had no further interest in the corporation or the land in suit; that the trial court found ''that said land was conveyed to Samuel Delannoy, but expressly made no finding as to whether or not said property was conveyed in full satisfaction of all claims of plaintiff against defendant,'' and that this amounted to a finding in favor of the plaintiffs.

We think the appellants misinterpret the finding of the lower court, and seek to restrain the holding here within bounds far narrower than its language permits. It should be borne in mind that real property alleged to have been situated in San Bernardino and Riverside Counties constituted the subject of the action and that appellants claimed an interest therein as a basis for their prayer for the appointment of a receiver. The trial court found that appellants had no interest in said property and that there was no necessity for the appointment of a receiver. Beyond the issues presented the court could not venture, and it did not attempt to do so, but, confining itself within those limits, it found that the parties had no agreement such as alleged by appellants, and concluded that the defendants were not indebted to the plaintiffs, or either of them, in any sum whatsoever. It was testified that Delannoy admitted having received the Downey property in full settlement, and stated in the original opinion, that we ''must accept as true all evidence tending to establish the correctness of the finding as made.'' The exact language of the finding referred to by petitioners was as follows: ''The court expressly makes no finding as to whether or not the said property was conveyed in full satisfaction of all claims of the said plaintiff Samuel Delannoy against the said Alfred Quetu.'' Whether or not the plaintiffs had or might have some claim against Alfred Quetu could not possibly be determined, but as to the main issues presented by the pleadings in this case—being the existence of the alleged verbal contract, the indebtedness of the defendants to the plaintiffs and the interest of the latter in certain specified corporate property

—the trial court found adversely to appellants. These questions were the principal ones presented, and as their determination by the trial court was supported by substantial evidence its action is conclusive here.

The only remaining point advanced by petitioners is the contention that, notwithstanding testimony that a ranch was conveyed to Gabrielle Quetu in consideration for money advanced and services rendered by her, and the finding of the court below that she paid a valuable consideration therefor, this court should review the conflicting evidence and hold that which favors respondents to be unworthy of belief after it has been accepted as true by the judge who tried the case. [11] This court's duty begins and ends with the inquiry whether the trial court had before it evidence upon which an unprejudiced mind might reasonably have reached the same conclusion which was reached. (*Wallace* v. *Sisson,* 114 Cal. 42 [45 Pac. 1000]; *Cronenwett* v. *Underwriters,* 44 Cal. App. 568 [186 Pac. 826]; *Dunphy* v. *Dunphy,* 161 Cal. 380 [Ann. Cas. 1912B, 1230, 38 L. R. A. (N. S.) 818, 119 Pac. 512].)

The petition is denied.

Willis, J., *pro tem.,* concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 10, 1925.