[S. F. No. 6464.—Department One.—December 15, 1915.]

L. WOODARD, Respondent, v. GLENWOOD LUMBER COMPANY (a Corporation), et al., Defendants; I. T. BLOOM, Appellant.

CONTRACT—RIGHT TO CUT TIMBER—OBLIGATION TO ERECT SAWMILL AND MANUFACTURE LUMBER.—The contract in question, whereby the owner of a tract of timber land granted to a lumber company the right to cut timber therefrom, in consideration of which the company agreed to erect upon the lands a sawmill as soon as a certain railroad should be constructed in a designated locality, and "thereafter" to commence the manufacture of lumber, is properly construed, in view of the surrounding circumstances and conduct of the parties, as obligating the company, upon the erection of its mill prior to the construction of the railroad, to proceed with the manu-

facture and shipment of lumber, and the payment therefor as provided in the contract.

ID.—CONSTRUCTION OF DOUBTFUL CLAUSE—ACTS OF PARTIES.—The acts of the parties to a contract, accruing after the contract was made, may be looked to as indicating the construction which the parties themselves put upon a doubtful clause, and as aiding that construction.

ID.—REASONABLE DILIGENCE IN MANUFACTURING AND SHIPPING.—Under the terms of such contract, the lumber company, having once begun the manufacture and shipment of lumber in pursuance of the contract, without waiting for the construction of the railroad, was bound to continue such shipment with reasonable diligence.

ID.—RESCISSION—SPECIFICATION OF PARTICULAR GROUND—WAIVER OF OTHER GROUNDS.—The express reservation of a right in the owner of the land to rescind the contract for the specified ground of failure to make payments when due, cannot be construed as a waiver by him of other grounds of rescission.

ID.—UNREASONABLE DELAY IN MANUFACTURING — ACTION FOR RESCISSION.—The cessation by the lumber company of operations in sawing and shipping lumber, continued for more than a reasonable time, was a breach of a material requirement of the contract, and justified the owner of the land in refusing to be longer bound, and entitled him to maintain an action to obtain a rescission of the contract.

ID.—CONTINUING OBLIGATION—WAIVER OF PRIOR BREACH.—The obligation of the lumber company to cut the timber, to manufacture it into lumber, and to ship it, was a continuing one, and the fact that the owner of the land may have waived the breach up to a given time did not preclude him from asserting a subsequent breach.

ID.—PROMPTNESS IN RESCISSION—DELAY RESULTING FROM INDULGENCES EXTENDED TO DEFENDANT.—While the plaintiff, seeking to rescind a contract, is bound to exercise his right promptly, the defendant cannot rely upon delays which have been the result of an indulgence extended to him by the plaintiff.

ID.—JUDGMENT OF RESCISSION—RESTORATION OF VALUE RECEIVED.—The judgment decreeing the rescission of the contract in question does not violate the right of the defendants to have a restoration of everything of value received by the plaintiff under the contract.

ID.—PLEADING—UNREASONABLE DELAY IN ATTEMPTING TO RESCIND.—A complaint alleging a breach of the obligation to manufacture and ship lumber as of a certain day and a continuing breach thereafter for the period of two years up to the time of rescission, does not show on its face an unreasonable delay in attempting to rescind. If, in fact, all of the breaches alleged had been waived, this was a matter of defense.

APPEAL from a judgment of the Superior Court of San Mateo County, and from an order refusing a new trial. George H. Buck, Judge.

The facts are stated in the opinion of the court.

W. P. Netherton, and J. L. Johnston, for Appellant I. T. Bloom.

J. A. Elston, Black & Clark, and George Clark, for Plaintiff and Respondent.

Beasly & Fry, for Defendants Glenwood Lumber Co. et al.

Charles B. Younger, for Defendant First National Bank of Santa Cruz.

A. H. Jarman, and Theodore A. Bell, for Defendant William M. Aydelotte.

SLOSS, J.—The defendant, I. T. Bloom, appeals from the judgment and from an order denying his motion for a new trial.

The action was brought by the plaintiff for the purpose, primarily, of obtaining a decree declaring that the rights of the defendants under a certain contract had terminated. The contract in question was made on the fourteenth day of November, 1905, between the plaintiff, L. Woodard, as party of the first part, and the defendant, Glenwood Lumber Company, a corporation, as party of the second part. On that date Woodard was the owner of a tract of land in San Mateo County containing four hundred acres, and he also owned an undivided three-fourths interest in a neighboring tract containing one thousand four hundred acres. Both parcels were valuable chiefly for timber. By the terms of the contract here involved, Woodard, in consideration of one thousand dollars paid to him by the Glenwood Lumber Company, granted to said company the right to enter upon the lands and "take, cut, haul and carry away therefrom all the standing timber growing thereon at the times and in the manner and upon the conditions hereinafter named and upon the prompt payment of the sums of money hereinafter provided to be paid." Glenwood Lumber Company, in consideration of the foregoing, agreed to take, cut, and haul

away the growing timber on said land "upon the conditions hereinafter named," and to promptly pay therefor to the party of the first part the sums provided to be paid. Much of the controversy between the parties arose over the next succeeding clause in the agreement, which we quote in full. "The said party of the second part further agrees to erect upon the lands and premises above described a sawmill, the capacity of which shall be at least thirty to forty thousand feet per day. Said sawmill to be erected and constructed and in working order ready to commence operations, as soon as there shall be constructed and in operation a railroad from the city of Santa Cruz, crossing Gazos Creek; that thereafter said party of the second part shall commence to manufacture into lumber all the standing timber upon said land, suitable in the ordinary course of milling business, to be cut into lumber of any grade, marketable." The lumber company agreed to cut and ship from said land "annually as much lumber as they desire, but shall cut and ship about four million (4,000,000) feet," it being provided, however, that this amount might be reduced if the average wholesale price of lumber should fall below a certain figure. The company agreed to pay to Woodard $2.25 for each thousand feet of lumber taken from the first tract, and $1.6875 for each thousand feet taken from the second tract, these prices to be subject to certain increases in the event of a rise in the price of lumber. The contract further provided for the cutting into wood of so much of the growing timber not suitable for milling as might be marketable, Woodard to receive therefor the sum of fifty cents per cord for wood taken from the first tract and 37½ cents for wood taken from the second tract. There were like provisions for the cutting and shipment of tan bark at the prices of six dollars and four dollars and fifty cents per cord for bark taken from the first and the second tract, respectively. Written reports were to be rendered by the lumber company to Woodard on the twentieth day of each month for lumber, wood, and bark shipped in the preceding month, and payment for the lumber so shipped was to be made on the rendering of accounts and for the wood and bark within sixty days thereafter. It was agreed that the one thousand dollars paid to Woodard upon the signing of the contract should be treated as an advance payment on account of the first lumber cut and removed. No payment

was to be made for wood, bark, or lumber destroyed by fire while on the premises and prior to loading on cars or shipping.

The lumber company was to have possession of the property for the purposes named in the contract and to construct and operate over the land railroads or other roads, telegraph and telephone lines, and necessary buildings. The rights granted were declared to be exclusive, and it was further agreed that while the lumber company was cutting timber upon the lands, or within ten years thereafter, if said lumber company was in possession and should have performed all the conditions of its contract, it should have the right to purchase the first parcel for $15 per acre and Woodard's interest in the second tract for $11.25 per acre. All taxes on the land and timber were to be paid by Woodard. The party of the first part was given the right to cancel the contract in the event of the failure of the party of the second part to make any payment for sixty days after the due date.

Since the making of the contract the Glenwood Lumber Company has assigned its right to take timber, wood, and bark, and its option of purchase to the defendant Bloom, appellant herein, and has transferred to the defendant, Jacob Miller, its rights under its contract with Bloom.

The plaintiff's asserted right to terminate the contract and to have a decree declaring that the defendants have no interest in the land is based upon the claim that the Glenwood Lumber Company and its assigns failed to comply with the obligation to "cut, mill, and ship lumber from the land."

The complaint is in two counts. The second of these proceeded upon a theory which was not adopted by the trial court, and it need not, therefore, be given further attention. As has already been stated, the parties had radically conflicting views regarding the construction of the clause of the contract hereinbefore quoted, dealing with the obligation of the party of the second part to erect a sawmill and to commence the manufacture into lumber of standing timber on the land. The theory adopted by the plaintiff, and made the basis of his first count, was that the lumber company was not required to erect its mill until the railroad "from the city of Santa Cruz crossing Gazos Creek" should be constructed and in operation, but that the obligation to commence the manufacture and shipment of lumber arose as soon as the mill had been constructed and put in operation, without regard to the

completion of the railroad.    It was alleged in this count that
while the railroad had not been completed, the lumber com-
pany had nevertheless gone on with the construction of its
mill and had commenced the manufacture and shipping of
lumber.    This, it was alleged, was a waiver of the company's
right to defer performance until the completion of the rail-
road.    The contention of the defendants, on the other hand,
was that the building of the railroad to Gazos Creek was a
condition precedent to the obligation of the lumber company
to manufacture and ship lumber, and that, as such railroad
had never been constructed, the lumber company was not
called upon to manufacture or ship lumber.

The court, in its findings, adopted a construction of the
contract which, if not precisely in accord with the claim of
plaintiff, was yet substantially favorable to his contentions.
It found that by the disputed provision of the contract "per-
mission was granted to the Glenwood Lumber Company to
begin the work of manufacture and shipment of lumber from
said lands of plaintiff by any method of shipment it elected
to employ, and the manufacture and shipment of lumber,
from the lands of plaintiff, pursuant to said contract, was
never intended to depend solely upon whether a railroad from
the city of Santa Cruz crossing Gazos Creek was constructed
or operated.    Shipment of the timber products from said
lands by water was understood by the parties as agreed to
and as permissible under said contract and that they by their
acts so interpreted and construed said contract; . . . that
said contract was a contract whereby the parties intended a
certain lot of standing timber should be removed from the
lands therein described; that, while the parties to said con-
tract named therein a circumstance when the manufacture
and shipment of lumber from plaintiff's land would begin,
yet the court finds that such agreement with respect to a
beginning time was not an agreement that the Glenwood
Lumber Company could postpone indefinitely or forever the
manufacture and shipment of lumber from plaintiff's lands,
because no railroad crossed Gazos Creek from the city of
Santa Cruz; that by said contract, as fairly and reasonably
interpreted, if said Glenwood Lumber Company did not
manufacture and ship lumber from said plaintiff's lands
under the terms of said contract before such unreasonable
length of time as that the purpose and benefit of said con-

tract would be practically destroyed, said contract would have terminated notwithstanding no railroad crossed Gazos Creek from the city of Santa Cruz.

"That said defendant, Glenwood Lumber Company, as hereinbefore found by the court, decided and elected to pro ceed with the manufacture and shipment of lumber pursuant to the terms of said contract, notwithstanding no railroad was ever constructed or operated from the city of Santa Cruz across Gazos Creek."

We are satisfied that the language of the contract, read in the light of all the circumstances shown by the evidence, was such as to justify the court in its interpretation.

The disputed clause is not in and of itself entirely clear. It declares that the lumber company is to erect a sawmill and have it ready for operation as soon as the railroad shall be in operation, and that *thereafter* it shall commence to manufacture the lumber. The word "thereafter" may refer either to the erection of the mill or to the construction of the railroad. To be sure, the lumber company was not bound to build its mill until the railroad was in operation, but the clause still leaves it doubtful whether the event which fixed the obligation to commence manufacture was the construction of the mill, the operation of the railroad, or both. We believe that the fair interpretation of the clause is that the obligation to commence the manufacture of lumber was made dependent upon the erection and putting in operating condition of the sawmill. The right to postpone the construction of the mill until the railroad was built was a privilege accorded to the lumber company for its benefit. It was a right which might be waived. The company did waive it by proceeding to erect the mill and put it in operation without awaiting the railroad. Having waived this condition, it had brought about the event upon which its obligation to manufacture rested, and was bound to continue. This construction gives fair meaning and effect to the language of the clause, and also harmonizes with the true intent of the agreement as evidenced by the conditions surrounding the parties at the time they contracted. In briefly outlining these conditions, we must be understood to be setting forth the evidence, in so far as it is conflicting or subject to opposing inferences, in the light most favorable to the support of the judgment under review. This is the light in which the evi-

dence must be deemed to have been regarded by the court below, and represents, therefore, that view of the facts which is binding on this court on appeal.

In the first place, it is to be noted that the lands involved in the contract were chiefly valuable for timber. The contract contemplated the cutting of this timber and its manufacture into lumber. While the agreement was in force the plaintiff was precluded from making any use of his land, and the only revenue he might derive therefrom consisted of the stipulated sums to be paid him for stumpage, cordwood, and tan bark. After the cutting of the timber, the lumber company was to have an option to purchase the land at any time during ten years. At the time the contract was made the Ocean Shore Railroad, which was designed to run from San Francisco to Santa Cruz, was in course of construction, and this was the railroad which the parties had in mind in the provision relating to the construction of a railroad from Santa Cruz to Gazos Creek. The contract, however, did not require that lumber should be shipped by railroad or by any other designated means. There were in fact other possible modes of shipment. The lands were situated within a few miles of a landing at Pigeon Point, on the shore of the Pacific Ocean. At this point one Coburn owned and maintained a chute used for loading vessels lying off the point. This chute could be and was, after the execution of the contract, put in condition to permit the loading of lumber, and the Glenwood Lumber Company made arrangements with Coburn whereby, after completing the necessary alterations and repairs to the chute, it obtained the right to use the chute in loading lumber on vessels at Pigeon Point. Early in 1907 the Glenwood Lumber Company began the felling of timber on the land. In the spring of that year the mill was constructed. It was ready for operation in July or August, 1907, and at that time the sawing of timber into lumber was begun. The cutting, sawing, and shipping of lumber continued until the summer of 1908. During that period the lumber company had felled about five million feet of timber. A large quantity of lumber was shipped over the Pigeon Point chute, and payment made on account thereof to the plaintiff pursuant to the contract. In addition some eight hundred thousand feet of lumber was hauled from the mill to Pigeon Point, after the operation of the mill had stopped. There was some controversy between

the parties as to whether this was "shipped" within the meaning of the contract, and whether payment was due to the plaintiff on account thereof.   The question was finally settled in December, 1909, by the payment to the plaintiff of the contract price on this eight hundred thousand feet.   No further work in the sawing of lumber was done by any of the defendants; they taking the position, finally, that they were not bound to proceed in the absence of the construction of the railroad.   The facts above outlined go far to support the interpretation which the court placed upon the contract.   Some of the matters recited took place after the contract was made, but, under a well-settled rule, they may be looked to as indicating the construction which the parties themselves put upon the doubtful clause, and as aiding that construction.   (*Mayberry* v. *Alhambra etc. Co.*, 125 Cal. 444, [54 Pac. 530, 58 Pac. 68]; *Kennedy* v. *Lee,* 147 Cal. 596, 603, [82 Pac. 257]; *Mitau* v. *Roddan,* 149 Cal. 1, 15, [6 L. R. A. (N. S.) 275, 84 Pac. 145].)

In cutting down the timber, manufacturing and shipping some of it, the Glenwood Lumber Company was carrying out the underlying purpose of the agreement, viz., to convert the timber on the land into lumber for the benefit of both parties. The appellant contends that the felling of timber was only preparatory to the sawing which was to be done when the contemplated railroad should arrive.   But on this issue there is a conflict, and the evidence clearly supports the respondent's claim that the cutting of timber went far beyond the needs of such preparation.   Furthermore, the lumber company recognized that it was manufacturing timber pursuant to its obligation under the contract, by rendering accounts to the plaintiff and paying him the specified amounts on account of lumber shipped.   Various letters from the Glenwood Lumber Company to the plaintiff, following the shipments, referred to sums due "as per contract with you of November 14, 1905, for stumpage," or amounts "due you this date as per our contract with you of November 14, 1905," and the like.   Having begun the manufacture and shipment of lumber in pursuance of the contract, the Glenwood Lumber Company and its assigns were bound to continue such shipment with reasonable diligence.   Under the construction upon which the appellant insists, he or his assignor might at any time stop the further manufacture, and lie by without doing

anything until the railroad should be constructed. This was, indeed, the position which the defendants took when the plaintiff finally, in 1910, insisted upon the resumption of the operation of the sawmill and the shipping of lumber, under penalty of a termination of the contract. The railroad had not been built and the evidence before the court justified the inference that, in all probability, it would not be constructed for an indefinite time, if ever. If, then, the appellant's interpretation were to be adopted, the contract would mean that he could keep the plaintiff's land tied up by his rights under the contract, with its accompanying option of purchase, for a period which could not be measured, or, perhaps for all time. Meanwhile, it is to be noted, plaintiff is bound to pay taxes upon the land, while deprived of any beneficial attributes of ownership. In the absence of language in the contract plainly and unequivocally disclosing such intent, we cannot believe that so inequitable a result was contemplated by the parties. (*McNair & W. L. Co.* v. *Adams,* 54 Fla. 550, [45 South. 492].) The appellant points to the clause giving the plaintiff the right to cancel the rights of the lumber company in the event of a default, continued for sixty days, in making any payment due. The express reservation of a right to rescind for a specified cause indicates, so it is argued, that no other ground of rescission was contemplated. We cannot assent to this view. Delay in payments might not have afforded a sufficient reason for cancellation, if the contract had been silent on the point. The fact that plaintiff reserved the right to rescind on this ground does not justify the conclusion that he agreed that no violation of the agreement in any other respect, however vital, should be made the basis of a claim that the rights of the lumber company had terminated.

Under these views, the cessation of operations in sawing and shipping lumber, if continued for more than a reasonable time, was a breach of a material requirement of the contract, and justified the plaintiff in refusing to be longer bound. Notice of plaintiff's election to terminate the agreement was given to the defendants, and this action to obtain a judicial decree of rescission sought an appropriate remedy. (Civ. Code, sec. 3406; *Smith* v. *Blandin,* 133 Cal. 441, [55 Pac. 894].)

The appellant contends that the plaintiff lost his right of rescission by failure to assert the same promptly upon the occurrence of the facts giving him the right to rescind, viz., upon the cessation by the lumber company of the operation of its mill and the shipment of lumber. (Civ. Code, sec. 1691.)   It is, no doubt, the general rule that one seeking to rescind a contract must exercise the right promptly upon discovering the facts which entitle him to rescind. (*Bailey* v. *Fox,* 78 Cal. 389, [20 Pac. 868]; *Wills* v. *Porter,* 132 Cal. 521, [64 Pac. 896].)   Here the lumber company's cessation of work took place in July, 1908, and the alleged rescission was not made until two years later.   But the obligation to cut down the timber, manufacture it into lumber and ship it, was a continuing covenant.   Every day's failure, without justification, to resume operations was a new breach of the contract, and the fact that plaintiff may have waived the breach up to a given time did not preclude him from asserting a subsequent breach. (3 Page on Contracts, sec. 1496; *Jones* v. *Durrer,* 96 Cal. 95, [30 Pac. 1027].)   Furthermore, while the plaintiff is obliged to rescind promptly, the defendant cannot rely upon delays which have been the result of an indulgence extended to him by the plaintiff.   This rule is well illustrated by the decision in *Owen* v. *Pomona L. & W. Co.,* 131 Cal. 530, [63 Pac. 850, 64 Pac. 253], where a vendee of land sought to cancel the contract and recover the sums paid thereunder on the ground of the vendor's failure to give a good title.   The right of rescission accrued at a certain time, but the plaintiff did not then take any advantage of it, relying on defendant's promise to perfect its title.   The court, speaking through Beatty, C. J., said: "He had a right to accept and rely on the promise of the defendant to perfect its title and in the meantime to hold his right of rescission in reserve to be exercised, when, after a reasonable opportunity so to do, the defendant had failed or refused to redeem its promise.   For while it is true that the right to rescind must be exercised promptly and is lost by delay, it is equally true that it does not lie in the mouth of the delinquent party to object to a delay which has been granted at his instance in order to enable him to perform an agreement which he is unable to perform at the time stipulated.   On the other hand, it seems to follow that when, in consequence of some promise of the delinquent party, rescission has been

delayed beyond the proper time, the right to rescind will not be revived until a reasonable opportunity has been afforded for compliance with such promise, unless it is by its terms to be performed within a certain time.''

There was evidence which warranted the court below in concluding that the facts were such as to bring the present case within this principle. The cessation of operation of the mill and shipment of lumber took place in July, 1908. Thereafter the plaintiff repeatedly demanded that the lumber company and the defendant Bloom, its assignee, resume operations, but compliance with this request was avoided or refused on the ground that the defendants had had trouble with Coburn and could not use his chute for shipment. In the fall of 1908 the chute was burned down, but there was evidence that it could have been repaired and put in condition for the shipment of lumber. The plaintiff, according to his testimony, never agreed that all manufacturing and shipment of lumber should cease until the railroad was built. At the most, he acceded to a temporary cessation of work, because it was believed that the completion of the railroad would soon take place, and because of the difficulties attending shipment by water. This did not bind him to agree to a permanent or indefinite suspension of operations. The delay tolerated by the plaintiff was an indulgence extended to the defendants, and they are not entitled to insist that thereby he lost his right to finally insist that the contract must be carried on.

Nor do we think the plaintiff's rights are at all affected by the circumstance that, during the period when he was thus extending the period of performance, he treated the contract as in force and accepted payments for lumber and bark shipped thereunder. Such indulgence may have operated to deprive him of the right to rescind for any delay occurring theretofore, but for the reasons heretofore stated, it could not affect his right to rely on a subsequent breach. In this connection, much stress is laid upon the fact that in February, 1909, the plaintiff consented to the execution by the appellant Bloom of a chattel mortgage of the mill and certain personal property to the First National Bank of Santa Cruz. But, as we have seen, this was during the period when the plaintiff was allowing further time to Bloom and his as-

signors.  It was at most a waiver of the delay in operations up to that time and for a reasonable time thereafter.

The decree does not violate the right of defendants to have a restoration of everything of value received by the plaintiff under the contract.  The one thousand dollars paid to the plaintiff upon the execution of the contract was credited as a payment for the first lumber shipped.  Other payments were merely compensation for lumber, wood, and bark actually taken by the defendants.  The defendants had expended considerable money in building the mill and in constructing roads upon the property.  So far as the mill is concerned, the decree permits its removal within ninety days.  With respect to the road and other work done by the defendants under the contract, there is no evidence to show the value thereof to the plaintiff.  Furthermore, the court may well have concluded that this item of benefit to the plaintiff was counterbalanced by the loss suffered by him through the action of the lumber company in cutting some two million feet of timber which it had never sawed and a large part of which had, as the evidence showed, deteriorated in value by being allowed to lie exposed to the elements for several seasons.

It is claimed that the appellant's demurrer to the first count of the complaint should have been sustained, for the reason that the plaintiff alleged a breach of contract as occurring on July 10, 1908, and showed by his pleading that no claim of right to rescind was made for two years thereafter.  The complaint thus, it is asserted, shows upon its face an unreasonable delay in attempting to rescind.  We do not think this point is tenable, inasmuch as the pleading shows not only a breach upon the date of cessation of operation, but a continuing breach thereafter up to the time of rescission, it being alleged that from July 10, 1908, the defendants have "wholly failed, neglected and refused to perform any of the terms and conditions of said contract."  If, as we have already suggested, the obligation of the defendant was a continuing one, the complaint averred repeated breaches up to. the time of notice of rescission, and the period intervening between the original breach and the notice did not render the pleading subject to demurrer.  If, in fact, all of the breaches alleged had been waived, this was a matter of defense.

No other alleged errors are argued by the appellant. Upon the whole case, we think the material findings are fully sustained by the evidence, and that they justify the granting of the relief embodied in the decree. The judgment and the order denying a new trial are affirmed.

Shaw, J., and Lawlor, J., concurred.

Hearing in Bank denied.