[Civ. No. 741. Fourth Appellate District.—March 22, 1932.]

WILLIAM H. MOORE, Jr., Trustee, etc., Respondent, v. RONALD McDONALD et al., Appellants.

Raymond Benjamin, Rowen Irwin, J. O. Reavis, Claflin & Claflin and Paul W. Schenck for Appellants.

A. H. Swallow and Harvey & Heard for Respondents.

MARKS, J.—This action was instituted by respondent to subject certain property in the city of Bakersfield to a levy

of an execution in an action whereby the El Dora Oil Company recovered judgment against Ronald McDonald and three others in the sum of $35,000. Two pieces of property were involved which we will hereafter refer to as the "Hermitage property" and the "Opera Market property". The trial court held that the Hermitage property belonged to Ronald McDonald and was subject to the lien of the judgment and the levy of the execution, and that the Opera Market property belonged to Jennie McDonald and was free therefrom. Appellants appeal from that portion of the judgment subjecting the Hermitage property to the judgment and execution.

After the recovery of its judgment against McDonald and others, the El Dora Oil Company became bankrupt and respondent was duly and regularly appointed its trustee in bankruptcy and as such maintained this action. The abstract of the judgment for $35,000 was duly recorded in the county of Kern and execution levied upon the property by the sheriff, record title to which stood in the name of Jennie McDonald. The judgment has not been paid and Ronald McDonald has no other property out of which it can be satisfied. The complaint was drawn upon the theory that the Hermitage property was purchased by Ronald McDonald with his own money and title placed by him in the name of Jennie McDonald, she holding title for him. The answer was drawn upon the theory that the property was purchased by Jennie McDonald with her own money and that she held the title in fee free from any interest therein or claim thereupon by Ronald McDonald. It was alleged by the plaintiff that on or about the 22d of March, 1910, Thomas Alton, who was the owner of the Hermitage property conveyed it to Jennie McDonald by a good and sufficient deed of conveyance, the purchase price being paid by Ronald McDonald, and title taken by him in the name of Jennie McDonald for his use and benefit. The answer admitted and alleged that Alton conveyed the Hermitage property to Jennie McDonald by a good and sufficient deed of conveyance. The case was tried upon a somewhat different theory without an amendment to the pleadings and the findings followed the theory adopted by the parties on the trial rather than the allegations of the complaint and answer to which we have just referred.

The San Francisco Breweries Limited was a corporation controlled by London interests. In 1910 Thomas Alton was its managing agent for California, with offices in San Francisco. Ronald McDonald was its Kern County agent and representative. In that year the corporation decided to acquire control of the title to the Hermitage property in order to insure its use as a saloon for the sale of beer manufactured by it. There was an account in one of the Bakersfield banks in the name of the company, which account was under the control of McDonald. For some reason the corporation could not own real property in California. The sale of the Hermitage property was negotiated by Ronald McDonald and the company funds used to pay the purchase price of $24,000. Title was taken in the name of Thomas Alton. Almost immediately thereafter Ronald McDonald started negotiations for the purchase of this property which was consummated the same year and the purchase price paid by an exchange of credits between himself and the San Francisco Breweries Limited through the account in the Bakersfield bank. The deed was delivered to Ronald McDonald and when recorded the grantee named was Jennie McDonald.

The sole evidence for the plaintiff consisted of the testimony of Ronald McDonald called by the respondent under the provisions of section 2055 of the Code of Civil Procedure, and the deposition of Jennie McDonald introduced under the same section, together with a photostatic copy of a notarial record of a San Francisco notary, deceased at the time of the trial, showing that the deed acknowledged by him was from Thomas Alton to Ronald McDonald.

Jennie McDonald was the sister of Ronald McDonald. She testified that she lived in San Francisco up to the time of the great fire in 1906, immediately after which she and her father removed to Bakersfield, where she has since resided. Her mother died in 1895 or 1896, having been an invalid for almost ten years prior to her death. Miss McDonald testified that her mother had saved four or five thousand dollars in cash and United States Government bonds in the sum of two or three thousand dollars, and that she herself had saved about $1,000 during her residence in San Francisco. The money was all in twenty-dollar gold pieces, and according to Miss McDonald's testimony was kept in a knitted purse which was about six inches in length

and was stored in an old trunk in the basement of their San Francisco residence. The mother was of a very secretive nature and no one knew of her savings except the two women. Miss McDonald testified that during the fire she and her father escaped to Oakland, taking with them a few of their personal effects with Miss McDonald carrying their securities, together with the gold in the small knitted purse. She further testified that following the fire she and her father were taken to Bakersfield by Ronald McDonald and that she and her father carried the gold and securities with them in their pockets; that upon their arrival in Bakersfield she turned her hoardings over to her brother, who invested them for her, she having no further knowledge of the money, securities, or investments made except that furnished her by her brother.

The estate of the mother was never probated. Miss McDonald testified that her mother told her she wished her daughter to have all her property after her death and gave the securities to her prior to death. Ronald McDonald testified that the estate consisted of the gold, United States government bonds and Spring Valley Water stock and that the total value of the money and securities turned over to him did not equal the sum of $10,000; that he sold the stocks and bonds and successfully invested and speculated with the sister's money so that in 1910 he had increased her holdings to the value of about $18,000. Both the appellants testified that Ronald McDonald purchased the Hermitage property for Jennie McDonald and that she ultimately paid the purchase price for it.

Ronald McDonald testified that he had a place of business for a considerable time, between 1910 and 1929, in the Hermitage property, and rooms there for a number of years during that period for which he paid his sister no rent; that he collected all the rents, took care of all the business transactions in connection with the property, paid all the taxes, insurance, repairs, improvements thereon for his sister and otherwise completely managed it for her. He could produce no vouchers, receipts, or records of accounts showing his payment of any of the income from the property to the sister. A number of years after the purchase of the property he arranged a lien upon the Hermitage property and the Opera Market property to secure a note for the sum

of $50,000, the proceeds of which were used for the financial assistance of one of his friends who was entirely unknown to his sister. The remaining material facts will be gleaned from the quotations from the testimony of Ronald McDonald hereinafter set forth.

Appellants maintain that two findings of the trial court are not supported by the evidence and are contrary to it. These findings are, first, that the Hermitage property was paid for by Ronald McDonald and not by Jennie McDonald, and, second, that the original Alton deed as executed and delivered by Alton was made to Ronald McDonald as grantee, who after its delivery to him erased his name therefrom and substituted the name of Jennie McDonald in its place and as so changed had the deed recorded.

We have concluded that the following testimony of Ronald McDonald, in addition to the facts already detailed, amply support these findings which are challenged by appellants: "Mr. Harvey: Q. Now where was the money paid to Thomas Alton for this property when it was purchased from him? A. It was really paid in San Francisco; it was taken out of the brewery account in the Kern Valley Bank in Bakersfield; I don't remember the details but it was an exchange of credits. . . . Q. How did your sister pay for it? A. Well, you are talking about my sister's purchase from Alton—my sister paid for it from time to time. I can't go through the details when she paid for it. She did not have the full amount of money to pay for it. It was carried for some time on the books. Q. She didn't have the money at the time to pay for it? A. She did not have $24,000 at the time to pay for it. Q. Do you know how much money she had at that time? A. I can't recall what the details of the transaction were; it ran along for some time before it was paid for. Q. Do you recall the other day you were asked this question: 'Q. In other words, the San Francisco Breweries charged your account with the $24,000, is that it? A. No, the San Francisco Breweries carried the account until my sister's money—she got her money together—at least I got her money together and cleared it. She did not have any account in the bank; it was the San Francisco Breweries, Limited, account.' Q. Is that correct? A. Yes, that is correct. Q. And do you remember it was charged against your account with the San Francisco Breweries?

A. I didn't say that—the San Francisco Breweries account was not my individual account. Q. Your sister was supposed to have bought this property for $24,000 from the San Francisco Breweries, Limited? A. Yes, sir. Q. And didn't she have the money? A. Yes, sir. Q. And in the meantime where did the money come from to pay for it, the $24,000? A. It came from her—my sister's money from time to time. Q. In the meantime, before she got her money together, where did the money come from? A. It was not paid for; she made a deposit and paid a portion of it and paid for it from time to time. Q. It was paid for, was it not, out of the account that you carried with the San Francisco Breweries, Limited? A. Yes, sir. Q. Where was the deed to your sister delivered, Mr. McDonald? A. I suppose it was delivered at the bank—my office was in the bank at that time. Q. In the office of the Kern Valley Bank? A. Yes, sir. Q. Don't you remember that the deed was delivered to you at San Francisco? A. I don't recall that; it may be but I don't remember those small details. Q. In any event you got the deed? A. Yes, I think the deed was delivered to me. I transacted all of her business at the time. Q. You transacted all of your sister's business and you got the deed, is that correct? A. I judge I did. I got the deed and held it until the transaction was closed up. Q. Now, Mr. McDonald, I will ask you to state who was the grantee named in that deed from Thomas Alton? A. Well since this hearing came up it emphasized my memory some— I always had it in my hands and always thought that I had changed the deed, but I don't think I did change it from what evidence I got here. Q. Have you got some new evidence? A. No, only from the argument and testimony that I heard here. Q. You don't think now that you did change the deed after you received it? A. I say, it is a long time to remember and I don't want to state something that is not true, and it is impossible for me to decide whether I had that or whether it was changed by Mr. Alton or who, if it was changed. Q. It was changed? A. If that was the deed, that was changed. Q. Well wasn't the deed made out to you originally, Mr. McDonald? A. I believe it was; whether it was the same deed or not. Q. At the time you received the deed from San Francisco, your name was on there as grantee, is that correct? A. That I cannot be positive or

whether there was another deed. When the transaction was closed Mr. Alton sent the deed down to the office. Q. You don't recall any other deed? A. That is where I am puzzled; I can't remember any other deed. Q. You don't remember another deed from Thomas Alton to R. McDonald? A. I can't positively remember that it was from Thomas Alton to Ronald McDonald direct, but I have an idea that that was the first deed. Q. And that the first deed was from Thomas Alton to you? A. Yes, if there was more than one deed but if it was changed I think the first one was to me. Q. Is it not a fact, Mr. McDonald, that you yourself erased the name Ronald McDonald as the grantee in that deed and inserted in it the name of your sister Jennie McDonald? A. I can't recall that I did. It may be possible. Q. In other words you say you might have done it? A. Anything is possible, but I can't recall that I did it if I did do it. Q. It is possible then that you may have done that? A. Yes, it may be possible. . . . Mr. Harvey: Q. Now, Mr. McDonald, you recall giving your deposition in 1927, in my office, before Nellie C. Denslow, a notary public in this county and state? A. I do, yes. Q. Now do you recall at that time being asked these questions, and giving these answers, page 37: Q. Did you give your sister a deed to the Hermitage property? A. I certainly did. I just remember Alton did deed it to me before he deeded it to my sister. I know there was quite a delay in closing the deal between me and Mr. Alton. Q. You now recall giving a deed to the property to your sister from yourself? A. No, I cannot recall it; after Alton deeded it to me I must have deeded it to my sister, I don't remember the transaction, the deed from Alton was direct to me.' Q. Do you recall giving that testimony at that time? A. I don't recall giving it, but it is a fact if it is in that deposition. I don't recall the entire deposition or any portion of it. . . . Q. Have you anything to show that you turned that money over to her, in the way of cancelled checks or vouchers or anything of that kind? A. It was her account that I collected. Whenever I collected the money I put it on her account. Q. Have you anything to show that you ever, by check or receipt or voucher of any kind, to show that you ever paid to Jennie McDonald any of this rent which you collected? A. I have no receipts; I took no receipts. Q. You have no receipts and no cancelled

checks? A. Well yes I have; I have some C.D.'s. Q. Where are they? A. She has them I guess. In fact I know she has. I collected the interest on one or two of them just recently for her. Q. You say she has C.D.s', you mean certificates of deposit at the bank; she would cash them? A. No, she does not cash them; she carried them; she does not carry any checking account. Q. She has no checking account at all? A. No, she has never had a checking account. Q. In what form did you turn this money over to her? A. When I collect the $400 I give it to her. Q. In what form do you give it to her? A. Hand it to her. Q. In cash? A. Cash or currency or whatever she wants. I put it in whatever shape she wants it. Q. But you have no receipts or cancelled checks to show that, have you? A. No. Q. When you get a check payable to you as Ronald McDonald, what do you do with that? A. Endorse it Ronald McDonald, agent, get the money and take it to her home. Q. That book that you have been consulting there, Mr. McDonald, does that show where you paid her any money? A. No, sir. Q. It does not? A. No. Q. You have no record to show that you ever paid her any money at all, have you? A. None at all.''

It is well recognized by all courts that in cases of this kind where the facts and circumstances of a transaction are entirely within the knowledge of the adverse parties it is often impossible for a plaintiff to secure direct testimony of the real facts of a transaction of the nature of the one here involved. Under such circumstances the trial court is permitted to draw reasonable inferences from the evidence and upon such inferences base its judgment. As was said in the case of *Maxson* v. *Llewelyn,* 122 Cal. 195 [54 Pac. 732, 734] : ''By appellant it is first insisted that the charge of fraud and the evidence in support of it are both insufficient, in that it is not made to appear that at the time Larrabee made the representations to Llewelyn he did not believe he could procure such a policy, and that the only testimony upon the point is that such policy was not, in fact procured. It would in most cases be extremely difficult, and in many cases absolutely impossible, to procure direct evidence of this nature. In all cases it is permissible to prove fraud by circumstances, and in most cases it is the only evidence available. In aid of the direct facts

proved, legitimate inferences are permitted to be indulged to establish other facts not directly in evidence. (*Butler* v. *Collins,* 12 Cal. 457; *Levy* v. *Scott,* 115 Cal. 39 [46 Pac. 892].)'' Our duty under these circumstances is set forth in *Mah See* v. *North American Acc. Ins. Co.,* 190 Cal. 421 [26 A. L. R. 123, 213 Pac. 42, 44]. ''This court has frequently held that even though all the facts are admitted or uncontradicted, nevertheless, if it appears that either one of two inferences may fairly and reasonably be deduced from those facts, there still remains in the case a question of fact to be determined by the jury (or by the trial judge where the case is tried without a jury), and that the verdict of the jury or the finding of the trial judge thereon cannot be set aside by this court on the ground that it is not sustained by the evidence. (*Anderson* v. *Los Angeles Transfer Co.,* 170 Cal. 66 [148 Pac. 212].) In so far as the evidence is subject to opposing inferences, it must upon a review thereof be regarded in the light most favorable to the support of the judgment (*Woodard* v. *Glenwood Lumber Co.,* 171 Cal. 513, 519, 520 [153 Pac. 951]; *Hassell* v. *Bunge,* 167 Cal. 365, 367 [139 Pac. 800]). 'In reviewing a question of this kind, all the inferences reasonably possible from the evidence favorable to the plaintiff (the prevailing party) must be indulged by this court.' (*Bandle* v. *Commercial Bank of Los Angeles,* 178 Cal. 546, 547 [174 Pac. 44, 45].)''

We believe that certain portions of the testimony of the appellants were so inherently improbable that the trial court was not only justified but was required in the exercise of sound discretion to reject certain portions of it, especially the testimony concerning the hoarding of $5,000 in twenty-dollar gold pieces, which would have a total weight of about fifteen pounds, in a small knitted purse about six inches in length, and the storing of this money, together with valuable stocks and bonds in an old trunk in the basement of a San Francisco house for many years. We believe that the complete lack of any knowledge shown by Miss McDonald of any business transactions supposedly carried on for her by her brother, together with his complete possession and control of the Hermitage property for many years, together with Ronald McDonald's testimony which we have quoted, rather conclusively shows that he paid for

the Hermitage property and received the deed, thereafter substituting his sister's name for his own in exact accordance with the findings of the trial court. These findings are amply supported by the evidence and the reasonable inferences which the trial court drew from it.

■ Appellants strenuously maintain that as the findings and judgment, if supported, must be sustained by their evidence and inferences therefrom, and as the trial court rejected part of it as inherently improbable and false, all of it must be rejected for the same reason, leaving the record barren of any evidence at all to support the final judgment. While it is true that the evidence of a witness, false in one particular, must be regarded with suspicion in others, it is not true that because certain testimony is doubted and rejected by the trial court all of the testimony given by such an unreliable witness must be rejected. The trial court is made the judge of the weight and sufficiency of the evidence and the credibility of the witnesses to meet a situation of this kind. If the trial judge can glean flashes of truth from the evidence of a witness whom he concludes has been false in other portions of his testimony, he may base his findings and judgment upon the portions of such evidence which he can accept as true.

■ Appellants further complain that the trial court committed prejudicial error in refusing to grant their motion for a new trial on the ground of newly discovered evidence. In an affidavit submitted in support of their motion it is set forth that at the time of the trial their attorneys sent searchers to the office of the county recorder of Kern County to search for the recorded copy of a quitclaim deed to the Hermitage property supposedly given by Ronald McDonald to Jennie McDonald in 1911; that they found the index record of such a deed, but that the volume containing the record could not then be found. They made no request at the trial for a continuance of the case to secure the missing record and did not call to the attention of the trial court the fact of the supposed existence of the deed or that the original had been lost, if it were lost, or that the book containing the copy was not available at that time. It appears from the record before us that the deposition of Jennie McDonald was taken in the presence of one of her then attorneys almost two years before the trial of the action.

In this deposition appears some discussion of the possible existence of such a deed. The statement of these facts entirely negatives the contention of appellants that the existence of this deed was newly discovered evidence or that they used any diligence to produce it or its recorded copy at the time of the trial. It does not seem possible that the existence of such a deed could be newly discovered evidence to appellants when one of them as grantor was supposed to have executed it to the other as grantee. We find no error on the part of the trial court in refusing to grant appellants' motion for new trial upon this ground.

■ Appellants forcefully maintain that as the pleadings admit the execution of a deed to the Hermitage property from Thomas Alton to Jennie McDonald this must be taken as an admitted fact and that the contrary finding of the trial court to the effect that the deed was executed to Ronald McDonald as grantee and changed by him after delivery by inserting the name of Jennie McDonald therein must be disregarded. They support this contention with well-considered authorities. We, however, do not consider this variance sufficiently material or prejudicial to the rights of appellants to warrant a reversal of the judgment by us.

The evidence supporting the finding that Ronald McDonald was named as the original grantee and that it was changed by him after delivery, was admitted without objection on the part of appellants. The case was tried upon this theory and the findings of the trial court are supported by the evidence consisting of admissions by appellants. We cannot conclude that they could successfully change their testimony upon this subject if the case were tried again. If the judgment were reversed and a new trial had, we presume that the evidence of these witnesses would be in accord with that given by them at the preceding trial. If the judgment were reversed respondent would amend his pleadings. If the case were then resubmitted upon the evidence of the appellants, a judgment in accordance with the one now before us would have to be entered. Section 4½ of article VI of the Constitution prohibits us from reversing a judgment ''for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained

of has resulted in a miscarriage of justice''. We are of the opinion that this section of the Constitution was adopted to prevent a reversal of a judgment under such facts as are now before us. (See, also, *Nittler* v. *Continental Cas. Co.*, 94 Cal. App. 498 [271 Pac. 555, 272 Pac. 309].)

Judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 13, 1932, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 19, 1932.