[Civ. No. 1341. Fourth Appellate District.—April 4, 1935.]

CARRIE L. HALL, Individually and as Administratrix, etc., Respondent, v. SAN JOAQUIN LIGHT & POWER CORPORATION (a Corporation), Appellant.

Thomas J. Straub, F. H. Pearson, W. R. Dunn and J. C. Wood for Appellant.

U. G. Hayden for Respondent.

MARKS, J.—Carrie L. Hall, Delia Elizabeth Hall and George W. Hall were the owners of farm property near the town of Kerman about thirteen miles west of the city of Fresno. Buildings and personal property on this farm were destroyed by fire on the morning of June 23, 1929.

After that date Delia Elizabeth Hall and George W. Hall died and Carrie L. Hall became the duly appointed, qualified and acting administratrix and executrix of their respective estates. This action was instituted to recover damages which resulted from the fire. It was alleged that the fire was caused by defective electrical wiring. Barney Schultz was not served with summons, and the action against Francis O. Wyant was dismissed during the trial. Judgment was rendered against appellant for $9,365 and this appeal followed.

Appellant presents but one ground for reversal of the judgment—that the evidence is insufficient to support the findings and judgment. It urges that the doctrine of *res ipsa loquitur* does not apply here and that when that doctrine is eliminated there remains no evidence of negligence to support the judgment.

We agree with appellant that the doctrine of *res ipsa loquitur* cannot be invoked in support of the judgment as the respondent alleged with great particularity in an amendment to her complaint the acts of negligence which she maintained caused the fire. She also introduced evidence of specific acts of appellant which she maintained caused the fire. The trial court found in accordance with the allegations of the amendment to the complaint and the supporting evidence. It is well settled that the doctrine of *res ipsa loquitur* cannot be relied upon by a plaintiff who alleges specific acts of negligence as the cause of injury. (*Ingledue* v. *Davidson*, 102 Cal. App. 697 [283 Pac. 837].)

The doctrine of *res ipsa loquitur* having been eliminated from the case, it remains for us to determine the question of the sufficiency of the evidence to support the findings of particular acts of negligence upon which the judgment must rest if it is to be affirmed. This will require a somewhat detailed analysis of that part of the evidence tending to support the questioned finding. From such an analysis, the difficulties confronting the plaintiff at the trial in her attempt to support her allegations of specific acts of negligence, of the trial judge in deciding the questions of fact, and of this court on appeal will become immediately apparent.

On the farm were numerous buildings, including a dwelling, and a tankhouse with a toolroom attached to it. The

first floor of the tankhouse was divided into two rooms, a storeroom and a separator room. These rooms had cement floors. The second floor formed a bedroom which was occupied by John Brooks, a laborer on the farm. Above the bedroom was an inclosed water tank. Attached to and on the south side of the tankhouse and adjoining the separator room was a toolroom with a dirt floor. In this toolroom was a well from which domestic water was pumped. The pump was operated by a five horse-power single phase motor. The switchboard which controlled the supply of electricity for both power and lighting purposes was placed on the outside south wall of the tankhouse, which was also the outside south wall of the separator room. This board was really within the toolroom. It was a wooden board upon which were attached the necessary electrical apparatus and wires, and was set out from the wall. Immediately behind it was a window. On June 22, 1929, several panes of glass were broken from this window. There were no solid doors in the toolroom or on the first floor of the tankhouse. They were all screen doors which permitted the circulation of air. The buildings on the farm were all constructed of wood. The electrical equipment and wiring had been originally installed in 1919, and was of sufficient capacity to accommodate an electrical current of 110 volts.

Prior to June 22, 1929, respondent desired to have an electric stove and an electric refrigerator installed in the dwelling. The installation of the stove required the increase of the current to 220 volts and also required a change in the meters and some of the wiring. She engaged appellant to make the necessary changes in the transformers, meters and power leads, and employed Wyant to change the wiring.

After studying the record in detail, and with reproductions of drawings before us, we will attempt to describe the switchboard with its electrical apparatus and wiring, and the connecting wiring, as it existed before and after the change, as clearly and accurately as the uncertainties in the record will permit. In so doing we will not attempt to distinguish between the portions of the equipment and wiring in the toolhouse and the tankhouse, but will refer to them as though all were in or attached to the tankhouse. We will use the designations "right" and "left" as though

we were standing facing north and the switchboard which was attached to the outside on the wall of the tankhouse and separator room. If we become confused in our endeavors we feel that we may be somewhat excused by the manner in which the witnesses were permitted to testify in the trial court from drawings and from diagrams on a blackboard not only concerning the switchboard but in describing the wiring and other objects. They were permitted to locate various articles "here" and "there" which, of course, was intelligible to counsel and the trial judge. Only three of the drawings are reproduced in the record and no attempt is made to designate where "here" and "there" might be. No attempt has been made to reproduce the blackboard diagrams. As to many objects we are entirely at sea when we attempt to isolate "here" from "there" or "there" from "here". Of course, if we should locate something "here" when it should have been "there" the appellant will have to be the unfortunate sufferer, as it was its duty to present the record, though counsel for respondent freely participated in the method of trial which has caused our confusion. We have called the attention of the bar to the unsatisfactory record which such a method of trial produces. We feel that our description of the switchboard is fairly accurate, but we are not so confident that we have correctly described other wiring and appliances.

We will first describe the switchboard and its connecting wires as they existed before the change was made. Two number four feed wires came down through a one and one-quarter inch conduit. They were fastened to posts at the head of a main knife switch which was on the upper left-hand corner of the switchboard. One light wire was taken from each of these posts and passed down on each side of the switch and into the left end of a galvanized iron gutter box four-by-four by twenty-four inches in its dimensions. These wires passed through the gutter box and out its right end, from which point they were taken upwards and attached to two posts on the top of a knife switch which controlled the lighting circuit. Two wires were connected to posts at the bottom of this switch and led to the light meter. Two wires came from this meter and passed up into a one-half inch conduit and furnished the feed back to the dwelling. Each of these wires was tapped before entering this conduit by wires

furnishing light for the tankhouse. The wires from these taps found their way inside of the separator room, where a wire or wires ran up its wall, across its ceiling and down its side to the separator. A light was taken off at the center of the ceiling. Other wires were taken off from this circuit and furnished lights for the bedroom in the tankhouse and for the toolroom. The two wires furnishing power for the motor were taken off from posts on the lower end of the main switch. These wires passed into the left end of the gutter box and one of them up through its top to a current transformer. Energy was taken by a similar wire from this transformer which passed through another opening in the top of the gutter box. This wire then passed along the gutter box and out of an opening in its bottom near its right end and into a starter. The other wire passed through the gutter box, out of it through the same opening and into the starter. Other similar wires passed from the starter through a metal conduit to the motor. They were each either number four or number six in size and were formed by twisting together either five or seven strands of number twelve or number fourteen copper wire and inclosed in insulation. We will refer to the first described as power cable number one, and the other as power cable number two in order to distinguish them from each other and from the number twelve light wires used elsewhere. A tap was made in the power cable number two inside the gutter box by attaching a number twelve wire to it which led through the top of the gutter box to the power meter. Two wires also connected the power meter with the current transformer.

The changes in the wiring were made on the afternoon of June 22, 1929, by Chester Marshall and other employees of appellant, and Francis O. Wyant, an independent contractor employed by plaintiff.

The employees of appellant made the following changes in the wiring which we must mention. The meter box was placed on the outside of the dwelling from which current was taken to the tankhouse by means of the number four wires leading to the switchboard. Marshall removed the transformer, power meter and light meter from the switchboard. He cut the number twelve light wires loose, but did not remove them. He cut the tap wire from power cable

number two and placed rubber tape and friction tape over the end of this wire which projected slightly from power cable number two. He spliced power cable number one. The testimony most favorable to respondent shows that in doing this he cut the insulation back from the two ends, twisted the ends of the cable together and taped the joint with rubber and friction tape without soldering the joint. He then placed the loose light wires and the two power cables back in the gutter box. Brooks testified that ''he put some wires together there and taped them. Some he left open.'' Marshall shoved the power cables and wires back into the gutter box when he completed his work. He gained admission to the gutter box by taking off the lid which was screwed to its face. He had trouble removing the screws and did not remove the one in the lower left-hand corner, but left the lid hanging and attached to the gutter box by that screw.

Wyant went to work when Marshall had finished. He removed from the gutter box and switchboard the light wires Marshall had cut. He connected the light wires that came through the one-half inch conduit to the top, and the light wires serving the tankhouse to the bottom of the light switch we have mentioned. He did nothing to the power wires. He changed the wiring on the motor to accommodate the new current of 220 volts.

All work was completed at about 6 o'clock in the afternoon of June 22, 1929, the installation was tested by turning on electric lights and the motor, after which the workmen left.

Wyant testified that he removed all loose light wires from the gutter box and took them off from the switchboard. This testimony is undisputed. We think it fair to conclude that the wires which Brooks described as being untaped and ''left open'' by Marshall were all removed by Wyant.

When the residents of the farm retired on the night of June 22, 1929, all electric lights were turned off and no appliances were operating. Normally there should have been no electric current flowing in any of the wires after that time. Brooks was awakened at about 2 o'clock on the morning of June 23d. He described the conditions he found as follows: ''I was awakened in the night by smoke, and my room was full of smoke; couldn't breathe. I couldn't think

what was the matter. I jumped up and ran down the stairs to see what was the matter and opened this door into this separator room here. And that room was all full of black smoke. And there was a fire right in this—on this switchboard. It was all afire. So I came around from the separator room into the tool shed with the intention of starting this five horse-power motor to flood the tank, to see if I could put the fire out. These wires in this gutter, bottom of this switchboard, were all red-hot. They were all a mass of flames. So I knew there was no use trying to start the motor. (Sentence stricken out.) I went around to the back, and there was a door in the back part of the separator room opposite this door. . . . I went around to the back and opened the back door, and the smoke was so dense and black that I couldn't see anything from there, so I went around to the front and went in the separator room again and the fire was following these wires, went up this wall across this ceiling and down the power pole (undoubtedly a mistake. Light wire on wall must have been intended) to the separator switch. Those wires were all burning across that wall. Mr. Hayden: Q. You say the wire was burning. I suppose that was the insulation? A. The insulation was burning.'' No other witness testified concerning the fire inside the tankhouse and tool shed.

Appellant suggests that the fire might have been and probably was caused by (1) spontaneous combustion; (2) something burning thrown into oil; (3) the defective work of Wyant.

There is no evidence that there was any waste or refuse in the tankhouse or in the toolhouse that could have been ignited by spontaneous combustion. Neither is there any evidence of the presence of oil in either building. When Brooks first saw it the fire was not burning below the gutter box, which was several feet above the floor.

The testimony of the witnesses for appellant seems to have absolved Wyant and his work from any blame. They testified that if the bare wires had come into contact this would have caused such a rush of current that the fuse would have been blown out before a fire could have been ignited. They were equally positive that contact between a naked light wire and wood would not have caused a fire because wood is a non-conductor of electricity and a contact between the wire and

the wood would not have created a circuit. They were of the opinion that there would have to have been a contact between a wire and grounded metal or such other conductor to have ignited a fire. There is no showing that there was any such conductor near the wires which had been worked on by Wyant.

Appellant produced expert witnesses who performed various experiments which, with their technical knowledge and learning, convinced themselves that it would have been impossible for any fire to have started from the switchboard, the gutter box or any wiring which had been worked on by its employees, even assuming the existence of all of the conditions claimed by respondent. Respondent produced one expert who was of the firm opinion that the fire was started from the splicing and taping of power cables number one and number two which had been done by Marshall and left by him in the gutter box. All experts are in agreement that if the splice and the stump of the cut tap wire had been properly taped no fire could have originated from that source.

The theory of the expert produced by respondent must be summarized. When the power cable and the tap wire were cut by Marshall, the end of the tap wire formerly attached to power cable number two and the end of each wire forming power cable number one were left with sharp knife-like edges. If any of the ten or fourteen sharp ends of the wires in the spliced cable were left protruding from the tape on the splice, or had cut through the tape, they would have come in contact with the metal gutter box, a circuit would have been formed and a flow of electricity started, if the gutter box were grounded. The same would have been true if the sharp end of the tap wire had cut through the tape surrounding it. A steady contact between an exposed wire and the gutter box, if grounded, would have caused a steady flow of electricity which would not have caused a dangerous amount of heat. If contact between the exposed wire or wires and the gutter box had been broken at regular intervals of about sixteen a second, an arc would have been formed which would have generated sufficient heat to ignite the insulation on the power cables in a period of time ranging from fifteen minutes to one hour. If the arc were once formed, it itself would have developed sufficient energy or resistance to keep the power cable vibrating and the arc continuing for an appreciable pe-

riod of time. The length of the arc need not have been more than 1/1000 of an inch. The evidence showed that a breeze was blowing with a velocity of between six and fourteen miles an hour during the night of the fire. The metal cover of the gutter box was hanging from one corner of the gutter box attached to it by a screw. A window with panes of glass broken from it was immediately behind the switchboard. The doors of the toolhouse and separator room were of screen, thus permitting the wind to blow through the broken window over which the cover of the gutter box hung. The wind would cause the cover to vibrate, which vibration would have been communicated to the gutter box sufficiently to set up a chattering of the cables which would have caused the arc. A vibration caused by force illustrated by light tapping with a lead pencil had caused an arc in experiments and would have been sufficient to cause the vibration and the consequent arc and fire.

All experts agreed that no flow of electricity could have occurred without the gutter box being grounded. Some time after the fire an iron pipe similar to those used as "ground stakes" was found driven into the earth immediately below this switchboard. It had a piece of copper wire about one inch long attached to it by a metal clamp similar to those used to attach ground wires to ground stakes. A piece of copper wire was found in the dirt near this stake with both ends of the wire showing evidence of having been burned and one of them fitting the end of the wire attached to the ground stake. There is evidence that the ground stake was seen in place before the fire, though no one testified that a ground wire was seen attached to it. There is also some slight evidence that a ground might have existed through the starter and metal conduit connecting to it. The foregoing evidence is sufficient to support the inference that the gutter box was grounded.

We think the evidence sufficient to support the inference that the fire started in the gutter box. The natural phenomena that fire travels upward much faster than downward is well known. When Brooks first saw the fire he said the power cables in the gutter box were glowing. This glow may well have been produced by the charring remains of the insulation on these cables. The wooden switchboard was burning, as was

a small portion of the wall for a short space above it. The light wires up the wall of the separator room and across its ceiling were smoking or burning and but little fire had been communicated to the adjacent wood. It is more reasonable to conclude that the fire started in the gutter box and climbed upwards than it is to assume that it started at a higher point and descended into the gutter box. Furthermore, there is no proof that would locate the cause of the origin of the fire above the gutter box and certainly nothing indicating it started below it.

It must be admitted that the only evidence of negligence on the part of Marshall is produced by inferences to be drawn from the evidence. If Marshall had left one or more of the strands of the cable protruding from the taped splice, the contact with the metal of the gutter box could have occurred. If the sharp edges of the tap wire and the strands of the cable had been covered by the tape and had Marshall rubbed them over the rough surface of the galvanized iron gutter box in returning the power cables to it, the sharp edges could have cut the tape and made contact with the gutter box, thus starting the flow of electricity. These are facts from which the inference may be drawn that the foregoing combination of circumstances actually happened and that the fire evidently originated in the gutter box from the defectively taped power cables. Had the splice and cut tap wire been properly taped and the wire edges smoothed into place even without soldering, the power cables would have carried safely at least two thousand volts of electricity for many years without danger of fire. As the fire could have been caused only by contact between an exposed wire and the gutter box, and as a wire would not have been exposed except for carelessness by Marshall in doing his work, the trial judge was at liberty to draw the inference of negligence on Marshall's part.

In *Mah See* v. *North American Acc. Ins. Co.*, 190 Cal. 421 [213 Pac. 42, 26 A. L. R. 123], it was said: "This court has frequently held that even though all the facts are admitted or uncontradicted, nevertheless, if it appears that either one of two inferences may fairly and reasonably be deduced from those facts, there still remains in the case a question of fact to be determined by the jury (or by the trial judge where the case is tried without a jury), and that the verdict of the jury

or the finding of the trial judge thereon cannot be set aside by this court on the ground that it is not sustained by the evidence (*Anderson* v. *Los Angeles Transfer Co.*, 170 Cal. 66 [148 Pac. 212]). In so far as the evidence is subject to opposing inferences, it must upon a review thereof be regarded in the light most favorable to the support of the judgment (*Woodard* v. *Glenwood Lumber Co.*, 171 Cal. 513, 519, 520 [153 Pac. 951]; *Hassell* v. *Bunge*, 167 Cal. 365, 367 [139 Pac. 800]). 'In reviewing a question of this kind, all the inferences reasonably possible from the evidence favorable to the plaintiff (the prevailing party) must be indulged by this court.' (*Bandle* v. *Commercial Bank of Los Angeles*, 178 Cal. 546, 547 [174 Pac. 44, 45].)''

We have reached the conclusion that as the trial court drew the inference of negligence on the part of Marshall from the evidence, and having particularly found that such negligence existed and that it was the proximate cause of the fire and resulting loss to respondent, we cannot disturb the judgment on appeal.

Judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 30, 1935, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 3, 1935.